UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| In re DISCOVER FINANCIAL SERVICES DERIVATIVE LITIGATION | ) ) ) | Lead Case No. 1:12-cv-06436 (Consolidated with No. 1:12-cv-06883) |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) ) | |

AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE AND UNJUST
ENRICHMENT

811155_2

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiffs on behalf of nominal defendant Discover Financial Services ("Discover" or the "Company") against its directors and certain officers for breaching their fiduciary duties, corporate waste, and unjust enrichment.

2.      Discover is one of the largest credit card issuers in the world and is best known for its Discover and Diners Club Cards. Between 2007 and 2011 (the "Relevant Period"), defendants caused Discover to market various fee based add-on products to its credit card customers. These products purported to offer Discover credit card holders financial protection against hardships such as job loss, sickness, identity theft, lost wallets, and low credit scores. Discover's fee based add-on products were quite lucrative for the Company, earning over $1.5 billion in annual revenue between 2007 and 2011.

3.      It was not until late 2012 that shareholders learned that Discover was using deceptive acts and practices to market its fee based add-on products. On September 24, 2012, defendants caused the Company to announce that it had entered into a Joint Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty (the "Joint Consent Order") with the Federal Deposit Insurance Company ("FDIC") and the Consumer Financial Protection Bureau ("CFPB"), to resolve a federal regulatory investigation into the improper and illegal marketing and sales scheme for certain credit card related products Discover sold to its consumers between December 1, 2007 and August 31, 2011.

4.      According to the Joint Consent Order, Discover repeatedly engaged in deceptive acts and practices and in unsafe and unsound banking practices in the marketing and sale of certain credit card products designed to enroll customers in fee based add-on products. Joint Consent Order at 1-2. Discover's misleading marketing and deceptive acts and practices included, among other things: (a) enrolling customers in these fee based add-on products based on highly deceptive and misleading

- 1 -

telemarketing calls; (b) charging some consumers for the products without the consumer's consent or knowledge of the cost or product they were signing up for; (c) manipulating claims payment process to minimize the chances of having to honor claims made under certain plans; (d) charging customers for products that were available for free; and (e) failing to withdraw customers from products upon request. Indeed, Discover was uniquely positioned to push these deceptive marketing practices on its customers because it had access to the person's personal and financial information and used that information to "target" consumers and make enrollment, including the securing of payments, easier.

5.    The magnitude of the deceptive acts and practices described in the Joint Consent Order demanded a stiff penalty, which was accomplished via the implementation of several operational and Board[1] level changes, restitution, and a significant financial penalty. *Id.* at 24-28. Specifically, Discover was required to cease and desist from, among other things: "operating Discover with an inadequate compliance management system"; "operating Discover without adequate oversight by the Board and supervision by senior management"; and "operating Discover with an inadequate system of internal controls and an inadequate internal audit system." *Id.* at 5-6. Each of the actions required of the Board by the Joint Consent Order was designed to require the defendants to operate Discover in compliance with federal law and all implementing rules and regulations, regulatory guidance, and statements of policy. *Id.* The Joint Consent Order also required Discover to pay restitution of $200 million and a $14 million penalty. *Id.* at 24-28.

6.    In addition to the Joint Consent Order, defendants' faithless acts have resulted in a class action lawsuit for violation of the federal securities laws which recently settled for $10.5

---

[1]    Discovery Board of Directors (the "Board").

million.  Discover is also facing lawsuits by the Attorneys General of West Virginia, Missouri, and Hawaii stemming from the same deceptive marketing practices identified in the Joint Consent Order.

7.     Of course, defendants, as Discover's officers and directors, have a fiduciary duty to the Company and its shareholders.  These fiduciary duties are the highest duties known to the law and require defendants to comply with all applicable laws, rules, and regulations. Yet, in disregard for their fiduciary duties, defendants made the conscious decision to operate Discover with unlawful sales, marketing and billing practices, despite being put on notice of the illegality of such practices through prior actions against its competitors for similar practices, lawsuits/investigations against Discover, regulatory investigations into Discover's practices, and government activity concerning these matters.  In fact, defendants' wholesale abdication of their fiduciary duties, including their duty of loyalty, allowed these improper marketing tactics to continue and flourish for nearly four years. Defendants' breaches of loyalty have damaged Discover and its once valuable corporate franchise.

8.     Although Discover has been severely injured, defendants have not fared nearly so badly.  Defendants pocketed tens of millions of dollars in salary, fees, stock options, and other payments that were not justified in light of the violations of law at Discover that occurred during their watch.  These payments wasted valuable corporate assets and unjustly enriched defendants to the detriment of Discover.

9.     Despite the severe injuries to Discover, the Board has not commenced, and will not commence, suit against defendants for breach of loyalty, corporate waste, and/or unjust enrichment, let alone vigorously prosecute such claims.  By this action, plaintiffs seek to vindicate Discover's rights against its wayward fiduciaries.

10.     It is well established that causing a company to operate in violation of the law is a breach of a fiduciary's duty of loyalty. *In re Massey Energy Co. Derivative and Class Action Litig.*, No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011).  As a result, defendants are

liable to Discover for damages caused to the Company from their disloyal and illegal marketing tactics. Accordingly, plaintiffs now bring this action to hold these disloyal fiduciaries accountable for the harm they caused Discover.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §1332 because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

12.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper under 28 U.S.C. §1391(a) because Discover maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

14.     Plaintiff James F. Groen is and has been a shareholder of Discover since 2007. Plaintiff is a citizen of the state of Michigan.

15.     Plaintiff Charter Township of Clinton Police and Fire Retirement System is and has been a shareholder of Discover since 2007. Plaintiff is a citizen of the state of Michigan.

- 4 -

**Nominal Defendant**

16.     Discover is a Delaware corporation with principal executive offices located at 2500 Lake Cook Road, Riverwoods, Illinois.  Discover is one of the world's largest credit card issuers. According to the Company's annual reports filed with the Securities and Exchange Commission ("SEC"), Discover Financial Services ("DFS") offers credit cards, student loans, personal loans and deposit products through their wholly owned subsidiaries, Discover Bank and Discover Home Loans, Inc.  In connection with its credit card business, Discover offers a variety of fee-based add-on products such as Payment Protection, Identity Theft Protection, Wallet Protection, Credit ScoreTracker, and others.  Discover is a citizen of the states of Delaware and Illinois.

**Defendants**

17.     Defendant David W. Nelms ("Nelms") has been a director of Discover since 1998. He has also served as Discover's Chief Executive Officer since 2004.  In breach of his duty of loyalty, Nelms caused or permitted Discover to engage in deceptive marketing practices which have exposed the Company to enormous damages and risks of loss.  Defendant Nelms received more than $25 million in unjustified payments from Discover.  Defendant Nelms signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011.  Defendant Nelms is a citizen of the state of Illinois.

18.     Defendant Lawrence A. Weinbach ("Weinbach") has been a director of Discover since June 2007 and was elected lead director in January 2009.  Defendant Weinbach signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011. Defendant Weinbach is a citizen of the state of Connecticut.

19.     Defendant Jeffrey S. Aronin ("Aronin") has been a director of Discover since June 2007.  Defendant Aronin sits on the Discover Board's Compensation Committee.  Defendant Aronin

signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011. Defendant Aronin is a citizen of the state of Illinois.

20.     Defendant Mary K. Bush ("Bush") has been a director of Discover since June 2007. Defendant Bush is a member of the Audit and Risk Committee and is deemed a financial expert as defined by the SEC. Defendant Bush signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011. Defendant Bush is a citizen of the state of Maryland.

21.     Defendant Gregory C. Case ("Case") has been a director of Discover since June 2007. Defendant Case is chairman of the Discover Board's Compensation Committee. Defendant Case signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011. Defendant Case is a citizen of the state of Illinois.

22.     Defendant Robert M. Devlin ("Devlin") has been a director of Discover since June 2007. Defendant Devlin sits on the Discover Board's Compensation Committee. Defendant Devlin signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011. Defendant Devlin is a citizen of the state of New York.

23.     Defendant E. Follin Smith ("Smith") has been a director of Discover since June 2007. Smith is the Chairman of the Audit and Risk Committee of the Discover Board which she has been a member of since June 2007. Defendant Smith is a designated financial expert as defined by the SEC. Defendant Smith signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2007-2011. Defendant Smith is a citizen of the state of Pennsylvania.

24.     Defendant Michael H. Moskow ("Moskow") has been a director of Discover since September 2007. Moskow has also served on the Audit and Risk Committee of the Discovery Board since September 2007. Defendant Moskow is deemed a designated financial expert as defined by the SEC. Defendant Moskow signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2008-2011. Defendant Moskow is a citizen of the state of Illinois.

- 6 -

25.     Defendant Thomas G. Maheras ("Maheras") has been a director of Discover since September 2008. Maheras also has served on the Audit and Risk Committee of the Discover Board since September 2008. Defendant Maheras signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2008-2011. Defendant Maheras is a citizen of the state of New York.

26.     Defendant Cynthia A. Glassman ("Glassman") has served as a director of Discover since February 2009. Defendant Glassman also has served on the Audit and Risk Committee of the Discover Board since February 2009. Defendant Glassman signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2009-2011. Defendant Glassman is a citizen of the state of Virginia.

27.     Defendant Richard H. Lenny ("Lenny") has been a director of Discover since February 2009. Defendant Lenny sits on the Discover Board's Compensation Committee. Defendant Lenny signed Discover's annual financial reports filed with the SEC via a Form 10-K for FY 2009-2011. Defendant Lenny is a citizen of the state of Illinois.

28.     Defendant Philip A. Laskawy ("Laskawy") served as a director of Discover from June 2007 to September 2008. He also served on the Audit and Risk Committee of the Discover Board from June 2007 to September 2008. Defendant Laskawy signed Discover's annual financial report filed with the SEC via a Form 10-K for FY 2007. Defendant Laskawy is a citizen of the state of Connecticut.

29.     Defendant R. Mark Graf ("Graf") has been Chief Financial Officer ("CFO"), Chief Accounting Officer, and an Executive Vice President of Discover since April 2011. Defendant Graf received more than $2.4 million in unjustified payments from Discover. Defendant Graf is a citizen of the State of Illinois.

30.     Defendant Carlos Minetti ("Minetti") has been Executive Vice President, President – Consumer Banking and Operations of Discover since April 2010. He also served as Executive Vice

- 7 -

President, Cardmember Services and Consumer Banking of Discover from September 2006 to April 2010, and as Executive Vice President, Cardmember Services and Risk Management from January 2003 to September 2006. Defendant Minetti received more than $10 million in unjustified payments from Discover. Defendant Minetti is a citizen of the state of Illinois.

31.     Defendant Roy A. Guthrie ("Guthrie") served as CFO, Chief Accounting Officer, and an Executive Vice President of Discover from 2005 to April 2011. Defendant Guthrie received more than $10 million in unjustified payments from Discover. Defendant Guthrie is a citizen of the state of Texas.

32.     Defendant Harit Talwar ("Talwar") has been Discover's Executive Vice President, President – US Cards of Discover since April 2010. Defendant Talwar also served as Executive Vice President, Card Programs and Chief Marketing Officer of Discover from December 2008 to April 2010, and as Executive Vice President, Discover Network from December 2003 to December 2008. Defendant Talwar received more than $8 million in unjustified payments from Discover. Defendant Talwar is a citizen of the state of Illinois.

33.     Defendant Mary Margaret Hastings Georgiadis ("Georgiadis") served as Executive Vice President, Chief Marketing Officer of Discover from 2004 to July 2008. As Discover's Chief Marketing Officer, Defendant Georgiadis was responsible for the Company's marketing practices, including its fee-based products. Defendant Georgiadis is a citizen of the state of Illinois.

34.     Defendants, and each of them, breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to violate applicable law, rules, and regulations. Defendants, and each of them, also failed to prevent the other defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, Discover has been exposed to hundreds of millions of dollars in damages and subjected to numerous lawsuits and investigations by the FDIC, and CFPB and various State Attorneys General.

- 8 -

### THE FIDUCIARY DUTIES OF DISCOVER'S OFFICERS AND DIRECTORS

35.     By reason of their positions as officers, directors, and/or fiduciaries of Discover and because of their ability to control the business and corporate affairs of Discover, defendants owe Discover and its shareholders a fiduciary duty of loyalty, and are required to use their utmost ability to control and manage Discover in an honest and lawful manner.  Defendants are required to act in furtherance of the best interests of Discover and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.     Each officer and director of the Company owes to Discover and its shareholders the fiduciary duty to exercise good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  Each officer and director of the Company had the duty and obligation to ensure the Company operated in compliance with all applicable laws and regulations, including, but not limited to, the marketing, sales, and billing of the add-on products at issue in this matter.

37.     Further, the defendants are responsible for conducting the Company's operations in accordance with the laws, rules, and regulations applicable to its business and affairs.  The failure to do so constitutes a breach of loyalty, such that the officers and directors may be held liable to the corporation for damages.  Stated differently, as the Delaware Supreme Court opined in *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006), where corporate fiduciaries fail to act in the face of a known legal duty to act, thereby demonstrating a conscious disregard for their

responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

38.     Each of the Director Defendants had specific duties pursuant to the Consumer Financial Protection Act and the Federal Deposit Insurance Act concerning the Company's operations.  They consciously failed to comply with these duties resulting in a breach of the fiduciary duty of loyalty.

**Defendants' Duties and Obligations Under
the Consumer Financial Protection Act**

39.     Each of the Director Defendants had the duty to ensure that Discover

develop[ed] and maintain[ed] a sound compliance management system . . . .
[Further, Discover is] expected to manage relationships with third-party service
providers to ensure that these providers effectively manage compliance with Federal
consumer financial laws applicable to the product or service being provided.

Weaknesses in compliance management systems can result in violations of
law or regulation and associated harm to consumers.  Therefore, the ***CFPB expects
every regulated entity under its supervision and enforcement authority to have an
effective compliance management system*** adapted to its business strategy and
operations.

Consumer Financial Protection Bureau Supervision and Examination Manual, Version 1 (Oct. 2011),

http://www.consumerfinance.gov/guidance/supervision/manual at CMR 1 (emphasis added).

40.     The CFPB specified the duties that the Director Defendants had:

An effective compliance management system commonly has four
interdependent control components:

•     Board and management oversight;

•     Compliance program;

•     Response to consumer complaint; and

•     Compliance audit.

*          *          *

- 10 -

In a depository institution, the board of directors is ultimately responsible for developing and administering a compliance management system that ensures compliance with Federal consumer financial laws and regulations and addresses and prevents associated risks of harm to consumers. In a non-depository consumer financial services company, that ultimate responsibility may rest with a board of directors in the case of a corporation or with a controlling person or some other arrangement.

\* \* \*

Because the effectiveness of a compliance management system is grounded in the actions taken by its ***board and senior management***, CFPB examiners should seek to determine whether the ***board and senior management*** have:

1. Demonstrated clear expectations about compliance, not only within the entity, but also to ***third-party service providers***.

2. Adopted clear policy statements regarding consumer compliance.

3. Appointed an appropriately qualified and ***experienced chief compliance officer*** and provided for other compliance officers with authority and accountability. (In smaller or less complex entities where staffing is limited, a full-time compliance officer may not be necessary. However, management should have clear responsibility for compliance management and compliance staff should be assigned to carry out this function in a manner commensurate with the size of the entity and the nature and risks of its activities.)

4. Established a compliance function to set policies, procedures, and standards.

5. Allocated resources to the compliance function commensurate with the size and complexity of the entity's operations and practices, the Federal consumer financial laws and regulations to which the entity is subject, and necessary to avoid the potential consumer harm associated with violations of such laws and regulations.

6. Addressed consumer compliance issues and associated risks of harm to consumers throughout product development, marketing, and account administration, and through the entity's handling of consumer complaints and inquiries.

7. Required ***audit coverage*** of compliance matters and reviewed the results of periodic compliance audits.

8. Provided for recurring reports of compliance risks, issues, and resolution through a committee structure or to the board.

*Id*. at CMR 2-3 (emphasis added).

41.     To ensure the Company operates in compliance with all applicable regulations, the CFPB requires Directors, such as the Director Defendants here, to understand the requirements of the relevant laws.  "Education of an entity's ***board of directors, management***, and staff is essential to maintaining an effective compliance program.  ***Board members*** should receive sufficient information to enable them to understand the entity's responsibilities and the commensurate resource requirements."  *Id*. at CMR 7 (emphasis added).

**Defendants' Duties and Obligations Under the Federal Deposit Insurance Act**

42.     Additionally, the Federal Deposit Insurance Act imposes certain duties upon the Defendants:

> Each insured depository institution shall prepare . . . a report signed by the chief executive officer and the chief accounting or financial officer of the institution which contains (A) a statement of the management's responsibilities for (i) preparing financial statements; (ii) establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (iii) complying with the laws and regulations relating to safety and soundness which are designated by the Corporation and the appropriate Federal banking agency; and (B) an assessment, as of the end of the institution's most recent fiscal year, of (i) the effectiveness of such internal control structure and procedures; and (ii) the institution's compliance with the laws and regulations relating to safety and soundness which are designated by the Corporation and the appropriate Federal banking agency.

12 USC §1831m(b).

43.     The Federal Deposit Insurance Act further requires that:

> Each appropriate Federal banking agency shall, for all insured depository institutions, prescribe (1)  standards relating to (A) ***internal controls***, information systems, and ***internal audit systems***, in accordance with section 36; (B) loan documentation; (C) credit underwriting; (D) interest rate exposure; (E) asset growth; and (F) compensation, fees, and benefits, in accordance with subsection (c); and (2) such other operational and managerial standards as the agency determines to be appropriate.

12 U.S.C. §1831p-1 (emphasis added).

**Defendants' Duties and Obligations Pursuant to Company Policies, the Company Code of Ethics and Business Conduct and Committee Charters**

44.     The Board and certain top executives of Discover bear significant responsibilities related to the Company's risk management that would have alerted each of them to the deceptive acts and practices described in the Joint Consent Order. The Company's annual report on Form 10-K for Fiscal Year 2012 spells out in detail the duties and responsibilities of the Board and certain executives regarding Risk Management at Discover and its wholly owned subsidiaries:

*Risk Management Roles and Responsibilities*

Responsibility for risk management is held at several different levels, including our board of directors, the Audit and Risk Committee of our board of directors, our Risk Committee, our Chief Executive Officer and senior executive officers, our Corporate Risk Officer, our corporate risk management department, our law and compliance department, and our internal audit department.

*Board of Directors*. Our board of directors is responsible for: (i) approval of certain risk management policies, (ii) approval of our risk appetite and strategic limit framework, (iii) oversight of our strategic plan, and (iv) appointment of our Corporate Risk Officer.

*Audit and Risk Committee of our Board of Directors*. The Audit and Risk Committee of our board of directors reviews reports from management on our enterprise-wide risk management program. The Committee also reviews with management the framework for assessing and managing our risk exposures and the steps management has taken to monitor and control such risk exposures. The Committee also reviews reports from management on the status of and changes to risk exposures, policies, procedures and practices.

*Risk Committee*. Our Risk Committee is an executive management-level committee, authorized by the Audit and Risk Committee of our board of directors and chaired by our Corporate Risk Officer, that provides a forum for our senior management team to review and discuss credit, market, liquidity, operational, legal and compliance, and strategic risks across the company ***and for each business unit***. Risk Committee membership consists of all members of our Executive Committee and our Corporate Risk Officer. ***The Committee regularly reports through reports of our Corporate Risk Officer to the Audit and Risk Committee of our board of directors on risks and risk management***. Our Risk Committee has formed a number of committees to assist it in carrying out its responsibilities. Each committee is guided by a charter that defines the mandates of the committee in further detail. ***These committees, made up of representatives from senior levels of management, escalate issues to our Risk Committee as necessary***. These risk management committees include the Asset/Liability Management Committee, the Capital

- 13 -

Planning Committee, the Counterparty Credit Committee, the Discover Bank Credit Committee, the Discover Bank Pricing Committee, the Payment Services Steering Committee, the New Initiatives Committee, the Operational Risk Committee, the Privacy, Policy and Compliance Committee, and the Fair and Responsible Banking Committee.

*Chief Executive Officer.* Our Chief Executive Officer is ultimately responsible for our risk management. In that capacity, our Chief Executive Officer establishes our risk management culture ***and ensures the business operates in accordance with our risk culture***. Our Corporate Risk Officer reports to our Chief Executive Officer.

*       *       *

*Corporate Risk Officer.* Our Corporate Risk Officer chairs our Risk Committee and manages our corporate risk management department. Our Corporate Risk Officer is responsible for establishing and implementing standards for the identification, management and measurement of risk on an enterprise-wide basis, as well as for monitoring and reporting such risks.

*Corporate Risk Management.* Our corporate risk management department is led by our Corporate Risk Officer and ***supports business units by providing objective oversight of our risk profile and ensuring risks are managed as defined by policy***. Our corporate risk management department also provides risk management tools and policies, and ***aggregates and reports our risks to our board of directors, the Audit and Risk Committee of our board of directors*** and our Risk Committee.

2012 Form 10-K at 12-14 (emphasis added).

45.     According to Discover's annual report, filed with the SEC on a Form 10-K and signed by the Board of Directors, the Board of Directors plays a primary role in managing risk related to the Company's (and its subsidiaries') operations.  For example, under the heading "Risk Appetite and Strategic Limit Structure," defendants caused the Company to state that "[r]isk appetite expressions and strategic limits are categorized by risk type, cascade through our committees and business units, and are incorporated into business decisions, reporting and day-to-day business discussions." *Id.* at 14.  Moreover, the annual report goes on to state that these "***[r]isk limits are monitored and reported on to various risk committees and our board of directors, as appropriate***." *Id.* (emphasis added).

46.     Discover's risk management program "is organized around six major risk categories: credit risk, market risk, liquidity risk, operational risk, compliance and legal risk, and strategic risk."

*Id*. at 15. The deceptive acts and practices that are the subject of the Joint Consent Order fall into the category of Operational and Compliance and Legal Risk. The annual report defines each of these as:

> *Operational Risk*. Operational risk arises from the potential that inadequate information systems, operational problems, breaches in internal controls, fraud or external events will result in reputational harm or losses. Operational risk also arises from model risk, which is the potential that we will incur a financial loss, make incorrect business decisions or cause damage to our reputation as a result of: (i) errors in financial and decision model design and development, (ii) misapplication of financial or decision models, or (iii) errors in the financial and decision model production process. We further differentiate operational risk into the following sub-categories: theft and fraud; employment practices and workplace safety; customer, ***products and business practices***; technology; physical asset and data security; processing; financial and reporting; and external provider.

> Operational risk exposures are managed through a combination of business line management and enterprise-wide oversight. ***Enterprise-wide oversight is provided through our Operational Risk Committee***. Responsibilities of our Operational Risk Committee include: (i) establishing and communicating operational risk policies, tolerance and philosophy; (ii) establishing procedures for implementing our operational risk measurement, monitoring and management policies; and (iii) reviewing aggregate risk exposures and the efficacy of our risk identification, measurement, monitoring and management policies and procedures, ***and related controls within our business units***. In addition, model risk is managed through a model governance process and models are subject to independent validation.

> *Compliance and Legal Risk*. Compliance risk is ***the operational risk of legal or regulatory sanctions, financial loss or damage to reputation resulting from failure to comply with laws, regulations, rules, other regulatory requirements***, or codes of conduct and other standards of self-regulatory organizations applicable to us. Legal risk arises, in part, from the potential that unenforceable contracts, lawsuits or adverse judgments can disrupt or otherwise negatively affect our operations or condition. ***These risks are inherent in all of our businesses***. Both compliance and legal risk are subsets of operational risk but are recognized together as a separate and complementary risk category by us given their importance and the specific capabilities and resources we deploy to manage these risk types effectively.

> Compliance and legal risk exposures are actively and primarily managed by our business units in conjunction with our law and compliance department. Our compliance program governs the management of compliance risk. ***Our Risk Committee oversees our compliance and legal risk management***. Our law and compliance department provides independent oversight for all of our compliance and legal risk management activities. Our law and compliance department coordinates with our corporate risk management department for the management of compliance and legal risks ***by reporting and escalating material incidents***, completing risk and control self-assessments, ***and monitoring and reporting key risk indicators***.

*Id.* at 15-16 (emphasis added).

47.     Each of Discover's annual reports filed with the SEC on Form 10-K for fiscal years 2007-2011, included substantially similar language detailing the Discover Board and its executives responsibilities regarding risk management.

48.     In addition to these duties, under the Company's Audit and Risk Committee Charter, the defendants on the Audit and Risk Committee (Bush, Glassman, Laskawy, Maheras, Moskow, and Smith) owed specific duties to Discover to monitor the Company's risk management. The Audit and Risk Committee's Charter provides, in relevant part, that the Audit and Risk Committee:

> [I]s appointed by the Board of Directors to (a) assist the Board in its oversight of the integrity of the Company's consolidated financial statements, ***the Company's compliance with legal and regulatory requirements***, the Company's system of internal controls, the Company's risk management, the qualifications and independence of the Company's independent registered public accounting firm ("independent auditor") and the performance of the Company's internal and independent auditors, and (b) prepare a report to be included in the Company's annual proxy statement.

49.     Further, the Audit and Risk Committee "shall review with the full Board any issues arising with respect to the quality or integrity of the Company's financial statements, ***the Company's compliance with legal or regulatory requirements***, the performance and independence of the Company's independent auditor, or the performance of the internal audit function."

50.     The Audit and Risk Committee Charter contained a section entitled "Oversight of Compliance with Legal and Regulatory Requirements" which stated:

> 1.  When deemed appropriate, review with the Company's General Counsel, or appropriate delegates, ***legal, disclosure or other matters that may have a material impact*** on the Company's consolidated financial statements or on the Company's compliance policies.
>
> 2.  Review any material reports or inquiries received from, and any reports of examination of, ***federal and state financial institution regulatory authorities and management's response thereto***. Obtain, review and evaluate ***reports from management with respect to the Company's compliance with applicable legal and regulatory requirements***, and the Company's Code of Ethics and Business Conduct.

- 16 -

The Company's ***Chief Compliance Officer*** shall have the authority to communicate personally to the Committee promptly on any matter involving criminal conduct or potential criminal conduct and, at least annually, shall report to the Committee . . . .

51.     Further, the Audit and Risk Committee was required to: "Review reports from management on the Company's enterprise-wide risk management program.   Review with management the framework for assessing and managing the risk exposures of the Company, including credit, market, liquidity and ***operational risks***, and the ***steps management has taken to monitor and control such risk exposures***."

52.     The Audit and Risk Committee is also responsible for overseeing the Corporate Risk Management System and the Corporate Risk Officer.   The Internal Audit Department reports directly to the Audit and Risk Committee.

53.     Under the Company's Code of Ethics and Business Conduct ("Code"), each member of the Board and each Discover employee is required to "[f]ollow both the letter and the spirit of the law."  The Code instructs Discover directors, officers, and employees that it is their "responsibility to understand the laws applicable to your responsibilities and to comply with both the letter and the spirit of these laws."  The Code emphasizes:

> ***Act in the best interests of customers, the company, and the public***.
>
> The Company seeks to outperform its competition fairly and honestly through superior performance.  ***Every director, officer, and employee must protect the Company's reputation by dealing fairly with customers***, the public, competitors, suppliers, and one another.  ***No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, or misrepresentation of facts***.
>
> \*        \*        \*
>
> ***Be honest and fair in your communications with the public***
>
> The Company has a responsibility under the law to provide accurate and complete disclosure to the investing public, and to the extent that you are involved in the preparation of materials for dissemination to the public, you must ensure that the information is accurate and complete in all material respects. In particular, the Company's senior financial officers, executive officers and directors must endeavor

to promote accurate, complete, fair, timely and understandable disclosure in the Company's public communications, including documents that the Company files with or submits to the United States Securities and Exchange Commission and other regulators.

Officers and employees must consult their business unit or department for standards that apply to oral and written communications with the public, as well as the circumstances under which communications must be reviewed by supervisors and others. If you become aware of a materially inaccurate or misleading statement in a public communication, you must promptly report it in accordance with the procedures outlined in the Reporting Misconduct section of this Code.

54. Defendants, because of their positions of control and authority as officers and/or directors of Discover, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55. Because of their advisory, executive, managerial, and directorial positions with Discover, each of the defendants had access to adverse, non-public information about the Company's risk exposure and violation of applicable law, rules, and regulations regarding the deceptive marketing practices.

56. At all times relevant hereto, each of the defendants was the agent of each of the other defendants, and was at all times acting within the course and scope of such agency.

**Breaches of Duties**

57. Each of the defendants, by virtue of his or her position as an officer and/or director, owe and owed Discover and its shareholders a fiduciary duty of loyalty to exercise good faith in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Discover, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its shareholders that the defendants were aware or should have been aware posed a risk of serious injury to the Company.

- 18 -

The conduct of the defendants who were also officers and/or directors of the Company has been ratified by the remaining defendants who collectively comprised all of Discover's Board.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct, and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rises to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duty of loyalty.

59.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**Defendants Fostered a Business Strategy Designed to Increase Discover's Fee-Based Financial Products to Its Customers at the Expense of the Company's Compliance with Federal and State Law**

60.     Discover is one of the nation's largest credit card issuers.  Discover earns hundreds of millions of dollars in annual revenue from the sale of several optional fee-based financial products. Discover markets these add-on products as ways for consumers to protect themselves from fraudulent or unauthorized charges or to enhance their financial security against such hazards or hardships like job loss or sickness, identity theft, lost wallets, or low credit scores.  Discover, however, often enrolled consumers in these products based on highly deceptive and misleading telemarketing calls, even charging some consumers for the products without the consumer's consent or understanding that their credit card will be charged for these products.  Discover is uniquely

- 19 -

situated to do this because, unlike a typical telemarketer, Discover marketed these products to its own customers. Thus, Discover had access to the targeted person's personal and financial information.

61. Discover sells at least four optional financial products for a monthly fee. These products are the Payment Protection, Identity Theft Protection, Wallet Protection, and Credit ScoreTracker plans (the "Plans"). Discover presents all four optional fee-based Plans as a way for consumers to increase their financial security, whether by protecting the customer from fraud or unauthorized charges, or insuring them against a loss of income. Discover charges $0.89 for every $100 of outstanding balance on the cardholder's account each month for Payment Protection; $12.99 per month for Identity Theft Protection; $2.99 per month for Wallet Protection; and $7.99 per month for Credit ScoreTracker. These fees are a significant revenue generator for the Company, generating $214 million, $249 million, $295 million, $412.5 million, and $428.2 million in 2007, 2008, 2009, 2010, and 2011, respectively. Although profitable, Discover's illicit marketing of the Plans violated state and federal consumer protection laws and exposed the Company to damages and loss.

**Payment Protection Plan – Deceptive Marketing Claims**

62. During the relevant period, the Payment Protection plan purported to temporarily suspend the cardholder's obligation to make regular monthly payments on their Discover card in the event of certain qualifying events. The qualifying events included involuntary unemployment, disability, hospitalization, or natural disasters. If a cardholder maintained an outstanding balance on their credit card, experienced a qualifying event, and otherwise met the requirements of the plan's terms and conditions, they may qualify for a temporary suspension of their monthly payment obligations.

63. The Payment Protection plan is similar to credit insurance in the sense that it purports to protect the borrower from defaulting if an unanticipated event disrupts the borrower's source of

income. Unlike credit insurance, however, the debt suspension portion of the Payment Protection plan does not actually make monthly payments as they come due each month. Instead, the Payment Protection plan only suspended the borrower's obligation to make monthly payments temporarily. Critics point out that debt suspension agreements are sometimes marketed to elderly consumers, for whom material benefits of the plan may be of little or no value.

64. To increase profits, Discover manipulated the claims payment process in its favor by limiting the chances of having to honor or pay Payment Protection plan claims. While on defendants' watch, Discover relied upon a deceptive practice known as "post claims underwriting" to accomplish this strategy. This is the practice of asking few or no questions of the cardholder at the time of sale to determine if the customer was likely to qualify for benefits should the need arise. When the customer attempted to use the "benefits" of the Payment Protection plan, Discover denied the benefits for reasons that were not disclosed at the time of sale. For example, numerous retired senior citizens were charged for the Payment Protection plan even though they were excluded from receiving unemployment benefits.

65. As a result of Discover's deceptive and unfair marketing schemes and claims practices, cardholders purchased a product that was virtually worthless to them, and were charged excessively for the useless product.

**Payment Protection Plan – Refusal to Take No for an Answer**

66. Discover enrolled far more of its cardholders through telemarketing than through the mail or online, the latter two of which required an affirmative act by the consumer to enroll, such as initialing their monthly statement in the designated place, authorizing enrollment, and mailing it back to Discover.

811155_2

67.     Most of Discover's cardholders were enrolled in the Plans through Discover's aggressive and deceptive telemarketing efforts and card activation calls.  Some of these calls were made internally by Discover, and others were made by telemarketing firms that Discover hires.

68.     In addition to Discover's financial motive to enroll as many of its customers as possible into its highly lucrative fee-based products, individual Discover telemarketers were incentivized to enroll as many cardholders as possible, either because their compensation was commission-based or because their performance was otherwise compensated on the number of cardholders they enrolled.

69.     Indeed, Discover's telemarketers tricked some consumers into unknowingly signing up for the Plans by employing numerous deceptive tactics to elicit an affirmative response from the cardholder without the cardholder actually understanding that they supposedly agreed to purchase an optional product for a monthly fee.

**Identity Theft Protection, Credit ScoreTracker, and
Wallet Protection Plans – Deceptive Marketing Claims**

70.     Discover also deceptively enrolled its customers in the Credit ScoreTracker, Identity Theft Protection, and Wallet Protection plans.  With Discover's Credit ScoreTracker, the cardholder was given a copy of their Experian credit report.  In addition, enrollees were given access to tools that allowed them to track their credit score on a daily basis and to receive e-mail alerts if there were changes to their credit score.  A main selling point Discover used to market this plan was the Experian credit report consumers receive.  Discover charged enrollees an additional $19.99 (in addition to the monthly fee) if they wanted credit reports from the other major credit reporting agencies.  Experian and the two other major credit reporting agencies, however, are required by federal law to provide consumers one free credit report each year.  Discover charges the cardholders' accounts $7.99 per month for this product.

71.     Discover's Identity Theft Protection plan purported to monitor the enrollee's credit score for indicia of identity theft and alert the enrollee if something suspicious happens to his/her credit score.  Discover enrolled its customers into this plan without their knowledge or consent and failed to withdraw customers from the plan upon request in order to continue billing them for the product.  Discover charged the cardholders' accounts $12.99 per month for this product.

72.     Under Discover's Wallet Protection plan, if the enrollee's wallet was lost or stolen, Discover will contact the issuers of the enrollee's credit cards to cancel the cards.  In addition, Discover represented that it will monitor a customer's credit for ninety days after their wallet is lost or stolen and wire the customer up to $1,000 in emergency cash.  Discover enrolled cardholders in this plan without their meaningful, knowing authorization and charged the cardholders' credit cards $2.99 per month.

**Discover's Marketing and Sale of the Plans Violated Federal Law**

73.     The FDIC and the CFPB conducted an investigation into the Company's marketing practices with respect to its fee-based products, including its Payment Protection plan.  The FDIC and the CFPB investigated defendants' illicit marketing practices that occurred between December 1, 2007 to August 31, 2011.  The federal regulators served the Company with subpoenas and a civil investigative demand for documents and testimony related to their investigation.

74.     In order to resolve the FDIC/CFPB investigation, on September 24, 2012, the defendants caused Discover to enter into the Joint Consent Order with the federal regulators.

75.     The Joint Consent Order contains many adverse findings, including:

The FDIC and CFPB have determined that Discover has engaged in deceptive acts and practices in or affecting commerce, in violation of section 5 of the Federal Trade Commission Act ("Section 5"), 15 U.S.C. §45(a)(l), and in deceptive acts and practices in violation of sections 1031 and 1036 of the CFP Act (together "Section 1036"), 12 U.S.C. §§5531, 5536, in connection with the marketing, sales, and operation of Discover's Payment Protection, Identity Theft Protection, Wallet Protection and Credit Score Tracker products, as well as any related predecessor

- 23 -

products (each a "Product" and, collectively, the "Products") that were offered and sold to individual holders of Discover consumer credit card accounts (each a "Cardmember") by Discover. The FDIC further has determined that Discover has engaged in unsafe or unsound banking practices.

Joint Consent Order at 1-2.

76.     In support of these conclusions, the FDIC and CFPB found that: "Discover's inbound and outbound telemarketing scripts contained material misrepresentations and omissions related to the Products. These misrepresentation and omissions were likely to mislead reasonable consumers about whether they were purchasing a Product during a telemarketing sales call." *Id.* at 3.

77.     The findings in the Joint Consent Order directly addressed the Board's conduct. The Board was required to comply with the fiduciary duties it has consciously disregarded by putting in place sufficient internal controls and compliance systems and to take action to stop the unlawful sales, marketing and billing practices that they knew of or consciously disregarded. Specifically, Discover was required to cease and desist from "operating Discover with an inadequate compliance management system," "operating Discover without adequate oversight by the Board and supervision by senior management," and "operating Discover with an inadequate system of internal controls and an inadequate internal audit system." *Id.* at 5-6.

78.     Further, certain provisions and mandates of the Joint Consent Order were aimed at rectifying these Board deficiencies, including a section entitled "Board Oversight." It was ordered that:

> The Board shall participate fully in the oversight of Discover's compliance management system, and take full responsibility for ensuring that appropriate policies and procedures are in place. The Board shall also ensure that Discover adequately supervises its compliance-related activities, consistent with the role and expertise commonly expected for directors of banks of comparable size and complexity and offering comparable banking products and services. Without limiting the generality of the foregoing, the Board shall require, consistent with this Order, policies and objectives to ensure that all marketing, sales, and operations efforts relating to the Products comply with Section 5 and with Section 1036, as described more particularly herein.

- 24 -

*Id.* at 6.

79.     The Joint Consent Order contained a timeline with specific actions Discover was required to take to remedy these issues and ensure there were no additional statutory violations. These actions included specifics for telephone solicitations, requisite disclosures, and the contents of material required to be mailed to customers.  *Id.* at 6-13.

80.     Discover was also required to develop "a risk-based compliance management system, including a comprehensive written compliance program ("Compliance Program") to ensure that the marketing, sale and operation of the Products comply with Section 5 and with Section 1036." *Id.* at 13.  This Compliance Program required "Board designation of Discover management responsible for review and approval prior to first use" of marketing and sales material.  *Id.*

81.     Discover was also required to "enhance its internal control system" and "review and revise its internal compliance audit program as necessary." *Id.* at 15.   The internal compliance audit program is required to include quarterly status reports to the Board and submission of a written report to the Board after each audit.   "No later than at its next regularly scheduled board meeting following receipt of the written audit report, the Board shall take action to address the audit's findings, correct any deficiencies noted, and implement any recommendations." *Id.* at 17.

82.     The Board was also required to establish an Oversight Committee, or designate an existing Board committee as an Oversight Committee.  *Id.*  The Oversight Committee will monitor Discover's compliance with the Joint Consent Order and submit written reports to the Board prior to each Board meeting.  The Joint Consent Order stated: "Nothing contained herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this Joint Consent Order." *Id.*

83.     There was also a monetary component to the Joint Consent Order.  Discover was required to pay restitution to its customers of $200 million. *Id.* at 24.  The restitution is paid to the

approximately 3.5 million customers affected by these practices during the December 1, 2007 – August 31, 2011 time period.  Discover also paid a fine of $14 million.  *Id.* at 28.

84.    The Joint Consent Order required Discover to "furnish to its shareholders a description of this Joint Consent Order."  *Id.* at 18.  The description was required to "fully describe the Joint Consent Order in all material respects" and was required to be "disseminated in conjunction with Discover's next shareholder communication and in conjunction with its notice or proxy statement preceding Discover's next shareholder meeting."  *Id.* at 19.

85.    Discover's Board each agreed to the terms of the Joint Consent Order.  *Id.* at 2. Discover's Board also admitted to its public shareholders (as required by the Joint Consent Order) that the Joint Consent Order was signed on September 24, 2012 via a Form 8-K filed with the SEC and with a further description in the Company's annual report on Form 10-K filed with the SEC on January 25, 2013.

86.    Following this Joint Consent Order, defendant Nelms stated that while Discover would continue to sell these products, "[w]e're on a glide path to selling fewer" of the products because of increased federal regulation.

**Additional Litigation Against Discover Relating to These Add-On Products**

87.    In addition, eight class action lawsuits were filed in relation to the sale of the Company's deceptive marketing practices. The cases were filed as much as one year before August 31, 2011, the end of the time period applicable to the Joint Consent Order.  Specifically, cases were filed on: July 8, 2010, in the U.S. District Court, Northern District of California (*Walker v. DFS Servs. LLC*); July 16, 2010, in the U.S. District Court, Central District of California (*Conroy v. Discover Financial Services*); October 22, 2010, in the U.S. District Court, District of South Carolina (*Alexander v. Discover Financial Services, Inc.*); November 5, 2010, in the U.S. District Court, Northern District of Illinois (*Callahan v. Discover Financial Services, Inc.*); December 17,

- 26 -

2010, in the U.S. District Court, Western District of Tennessee (*Sack v. DFS Services LLC*); January 14, 2011, in the U.S. District Court, Eastern District of Pennsylvania (*Boyce v. DFS Services LLC*); February 15, 2011, in the U.S. District Court, Southern District of Florida (*Triplett v. Discover Financial Services, Inc.*); and March 7, 2011, in the U.S. District Court, Eastern District of Pennsylvania (*Carter v. Discover Financial Services, Inc.*). All of the cases were transferred to the U.S. District Court, Northern District of Illinois pursuant to a multi-district litigation order issued by the Joint Panel on Multidistrict Litigation in February 2011.

88. These class actions challenged the Company's marketing practices with respect to its Payment Protection plan to cardmembers under various state laws and the Truth in Lending Act. The plaintiffs in these actions sought monetary remedies, including unspecified damages and restitution, attorneys' fees and costs, and various forms of injunctive relief including an order rescinding each class member's enrollment in the Payment Protection plan.

89. In June 2011, the Company and class counsel entered into a preliminary global settlement of all of the pending class actions. On November 9, 2011, the court granted preliminary approval of the settlement. The settlement encompasses Discover's sale and administration of the Plans. The settlement received final approval from the court on May 10, 2012, and resulted in a $10.5 million settlement and an additional $3.5 million for attorneys' fees.

90. On August 16, 2011, the Attorney General of West Virginia filed a lawsuit against the Company in the Circuit Court of Mason County, West Virginia (*West Virginia v. Discover Financial Services, Inc.*). The lawsuit asserts various claims related to the Company's marketing and administration of various fee-based products under West Virginia law. The relief sought in the lawsuit includes an injunction prohibiting the Company from engaging in the alleged violations, restitution, and disgorgement of monies received from the complained of practices, civil penalties, and costs.

- 27 -

91.     On August 26, 2011, the Attorney General of Missouri issued a request for information to the Company in connection with an investigation to determine whether the Company has engaged in conduct that violates Missouri law in the marketing of its Payment Protection plan to its credit card customers.

92.     On April 12, 2012, the Attorney General of Hawaii filed a lawsuit against the Company in the Circuit Court of the First Circuit, Hawaii (*Hawaii v. Discover Financial Services, Inc.*).  The lawsuit asserts various claims related to the Company's marketing and administration of various fee-based products under Hawaii law.  The relief sought in the lawsuit includes an injunction prohibiting named parties from engaging in the alleged violations, restitution, and disgorgement of monies received from the complained of practices, civil penalties, and costs.

**The Director Defendants Knew of, or Consciously Disregarded, the
Need to Alter Discover's Sales Practices and Procedures Concerning the
Add-On Products to Ensure Compliance with Applicable Laws But Failed to Do So**

93.     In addition to the litigation matters discussed above, Discover was engaged in other legal proceedings concerning its practices and procedures.  The Director Defendants were aware of facts indicating that Discover needed to review its sales and marketing practices concerning these add-on products to ensure complete compliance with applicable laws.  In fact, governmental and regulatory enforcement actions against Discover and its competitors for the same practices at issue here have been rampant for years.

94.     In December 2010, Discover was sued by the Minnesota Attorney General for deceptive practices for the same add-on products that are the subject of this litigation.  Importantly, the Minnesota Attorney General's lawsuit named Discover Bank, DFS Services, LLC and their parent company Discover Financial Services as defendants.  According to the Minnesota Attorney General, the lawsuit alleges that:

Discover Bank and its affiliated processing company made aggressive, misleading, and deceptive telemarketing calls to sign people up for these products. The company first lures the consumer into believing the call is a courtesy call from their credit card company and not a sales call – that is, that the caller is simply touching base to make sure the customer is aware of all the benefits of the card. In some cases, the company has charged people's credit cards for enrollment in these add-on products even though the consumer did not agree to purchase anything. In other cases, the company tricks people into unknowingly signing up for these products, usually by inducing consumers to say "ok" or "yes" to a benign statement without understanding they are signing up and then treating that response as authorization to bill their credit cards. In many cases, Discover refuses to make refunds to aggrieved consumers.

Moreover, the Attorney General's office noted "that it is particularly ironic for a credit card company like Discover to charge people's accounts for optional fee-based products without their informed consent because the credit card company touts its fraud prevention capabilities in protecting consumers from unauthorized charges." In November 2011, Discover (Discover Bank, DFS Services LLC, and Discover Financial Services) agreed to a consent judgment in order to pay $2 million to resolve this matter.

95.     The Minnesota Attorney General's lawsuit regarding Discover's deceptive marketing and sales practices was widely reported in the media. In a December 7, 2010 article, *The Wall Street Journal*, reported that "[t]he lawsuit . . . is the latest effort by authorities to rein in credit-card companies that are pumping up their profits by selling fraud-protection and other credit-related products to customers." The article went on to explain that credit card companies "are under even more pressure now to generate revenue from such [fee based add-on products] due to new laws that restrict certain practices that generated substantial profits in the past."

96.     On June 28, 2012, the Attorney General of Mississippi filed a lawsuit against the Company in the Chancery Court of the First Judicial District of Hinds County, Mississippi (*Mississippi v. Discover Financial Services, Inc.*). The lawsuit asserts various claims related to the Company's marketing and administration of various protection products under Mississippi law. The relief sought in the lawsuit includes an injunction prohibiting the Company from engaging in the

- 29 -

alleged violations, restitution and disgorgement of monies received from the complained-of practices, civil penalties, and costs.

97.     Additionally, class action lawsuits have been filed by cardholders against Discover alleging violation of the Telephone Consumer Protection Act, including a November 30, 2011 action filed in U.S. District Court, Northern District of California (*Bradley v. Discover Financial Services*) and a March 6, 2012 action filed in U.S. District Court, Northern District of California (*Steinfeld v. Discover Financial Services*).  Prior to these lawsuits, the Federal Communications Commission issued a citation to Discover, on June 26, 2007, for violation of the Telephone Consumer Protection Act.

98.     Moreover, for the past ten years there have been a series of investigations into similar illegal and improper practices in the industry.  During this time, other companies in the industry, utilizing similar practices and procedures as Discover, have also been investigated, fined, and sued for violations similar to those engaged in by Discover.

99.     In December 2000, Providian Financial Corporation resolved a consumer class action lawsuit regarding similar issues: marketing and sales practices of add-on products.  Providian Financial Corporation paid approximately $105 million to settle these claims.

100.     In January 2003, following a three-year investigation led by California, Illinois, New York, and Vermont Attorneys General, First USA, then associated with Bank One Card Services as the nation's largest issuer of Visa credit cards, agreed to a $1.3 million settlement with twenty-eight states regarding its deceptive telemarketing strategies.  First USA also agreed to police its third party vendors for future deceptive telemarketing aimed at its fifty-three million credit card customers. These are the same issues present in the instant matter: improper telemarketing practices and the failure of Discover to ensure its vendors complied with applicable regulations.

- 30 -

101. The CFPB recently, in joint action with the Office of the Comptroller and Currency, resolved an investigation of Capital One Financial Corporation's marketing and sale of credit card add-on products such as payment protection and credit monitoring services – the same issues the CFPB investigated in this matter. In consent orders agreed to by Capital One, the CFPB made findings that Capital One engaged in false and deceptive practices and exercised deficient oversight to detect and prevent the fraudulent conduct. Capital One agreed to pay nearly $215 million in restitution and penalties to resolve the allegations.

102. In May 2011, American Express settled litigation concerning false advertising. American Express paid $600,000 to resolve these claims.

103. Further, the Director Defendants were aware of increased government regulation and regulatory activity in the area of marketing and sales for credit card product, and consumer protection. They knew, or consciously disregarded, that the Company faced the increased possibility of liability concerning these issues and that therefore the Company should be made to comply with applicable law.

104. For example, the Credit Card Accountability Responsibility and Disclosure Act of 2009 (CARD) was signed by President Barack Obama on May 22, 2009. CARD contained requisite reforms in credit card practices, including unfair and deceptive contracts.

105. In 2009, the U.S. Government Accountability Office ("GAO") published a report analyzing the marketing practices utilized by the credit card industry. The GAO report found that most credit card issuers engaged in improper practices, including the delivery of plan information to consumers.

106. Despite all of the publicity regarding improper and illegal practices relating to add-on products in the industry, increased regulatory scrutiny, and lawsuits and investigations specifically

- 31 -

into Discover, defendants did nothing to stop the illegal conduct and instead allowed these practices to continue to generate millions of dollars in revenue.

## DAMAGES TO DISCOVER

107. As a direct and proximate result of defendants' actions, Discover has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying the settlements in the consumer class actions;

(b) costs incurred from defending and paying potential settlements in the lawsuits filed by the state Attorneys General of West Virginia, Missouri, and Hawaii;

(c) costs incurred from defending and paying the settlements in the FDIC and CFPB actions, including, but not limited to, the $200 million in restitution and $14 million in fines pursuant to the Joint Consent Order; and

(d) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Discover.

108. Moreover, these actions have irreparably damaged Discover's corporate image and goodwill. For at least the foreseeable future, Discover will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Discover's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE ALLEGATIONS

109. Plaintiffs bring this action derivatively in the right and for the benefit of Discover to redress injuries suffered, and to be suffered, by Discover as a result of breaches of fiduciary duty, corporate waste, and unjust enrichment, as well as the aiding and abetting thereof, by defendants.

- 32 -

110. Plaintiffs will adequately and fairly represent the interests of Discover in enforcing and prosecuting its rights.

111. The 11 members of the Discover Board are defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny. The Discover Board met 37 times between fiscal year 2008 and 2011.[2] Plaintiffs have not made any demand on the Discover Board to institute this action because such a demand would be a futile and useless act, and, therefore, excused.

**Demand Is Excused Because Defendants Nelms, Weinbach, Aronin,
Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny
Face a Substantial Likelihood of Liability for Their Misconduct**

112. As alleged herein, defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny knew, or consciously disregarded, that Discover's practices and procedures concerning the marketing and sales of these products violated the Company's internal policies and federal and state laws, rules, and regulations, or allowing such actions in conscious disregard of their duties. Further, these defendants knew, or consciously disregarded, that continuing such practices and procedures would subject Discover to liability, both civil liability and fines/penalties issued by government agencies.

113. Each of the Director Defendants were aware of deceptive acts and practices in the marketing and sale of Discover's fee based add-on products no later than July 2010 when the first of several class action lawsuits were filed alleging that the Company was engaged in deceptive acts and practices related to the sale and marketing of its fee based add-on products. These defendants were also made aware of the deceptive acts and practices related to their fee based add-on products when

---

[2] The Discover Board met nine times in 2008, 10 times in 2009, eight times in 2010 and 10 times in 2011.

Discover Financial Services was named as a defendant in a December 6, 2010, enforcement action filed by the Minnesota Attorney General. The Minnesota AG's lawsuit made nearly identical allegations regarding Discover's deceptive marketing of its fee based add-on products as those made by the CFPB and FDIC in the Joint Consent Order. Additionally, the lawsuit was widely reported in national media, including a December 7, 2010 article in *The Wall Street Journal*.

114. Indeed, the deceptive acts and practices that were the subject of the Joint Consent Order have been a target of federal and state banking regulators for at least ten years. For example, the California, Illinois, Vermont and New York Attorneys General investigated Bank One Card Services regarding its deceptive telemarketing strategies. Bank One Card Services settled these claims for $1.3 million in January 2003. Similarly, Providian Financial Corporation settled a consumer class action regarding its marketing and sales practices for add-on products for approximately $105 million in December 2000. In light of the ongoing efforts to curb deceptive marketing and sales practices for add-on products among Discover's competitors, defendants should have known about the risks associated with the Company's deceptive practices much earlier than July 2010.

115. Defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny also face a substantial likelihood of liability for failing to act on the information supplied to them from the Company's system of internal controls, which was purportedly designed to allow Discover to cause its business operations and subsidiaries to comply with its legal obligations under federal and state law and were found inadequate by the FDIC/CFPB. Specifically, each of these defendants were informed of the deceptive acts and practices alleged in the Joint Consent Order because they were significant risks under the categories of Operational Risk and Compliance and Legal Risk as defined in the Company's enterprise wide Risk Management policies. Discover defines Operational Risks as risks arising from "the potential that inadequate

- 34 -

information systems, operational problems, breaches in internal controls, fraud or external events will result in reputational harm or losses." Similarly, Compliance and Legal Risk is considered "the operational risk of legal or regulatory sanctions, financial loss or damage to reputation resulting from failure to comply with laws, regulations, rules other regulatory requirements, or codes of conduct and other standards of self-regulatory organizations applicable to us." Indeed, the deceptive acts and practices identified in the Joint Consent Order fall under either (or both) of these definitions. According to the Company's risk policies, risks that fall into these and other categories "are monitored and reported on to various risk committees our board of directors, as appropriate." In light of the various regulatory enforcement actions in Discover's industry related to similar deceptive marketing and sales tactics, and in no event later that July 2010, the significant risks associated with Discover's sales and marketing procedures was reported to the Board of Directors.

116.    Despite this knowledge, or conscious disregard of such knowledge, defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny allowed such practices and procedures to continue, and did not revise such to ensure that Discover was in compliance with all applicable statutes, rules, regulations, and Company policies.

117.    In fact, the fee based add-on products were a significant source of revenue and profits for the Company. Defendants were motivated to retain and/or grow this source of revenues in order to make up for new laws and regulations that now restrict certain practices that generated substantial profits in the past.

118.    Each of these defendants served on Discover's Board for at least part of the relevant time period when the Board chose to allow Discover employees to engage in illegal marketing and consciously disregarded the information provided to them, via Discover's internal controls, that the Company was receiving substantial revenues from illegal marketing to its own customers.

- 35 -

Accordingly, Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny all face a substantial likelihood of liability and cannot impartially consider a demand.

**Demand Is Excused Because the Board's Conduct Is Not
a Valid Exercise of Business Judgment**

119.     The wrongs alleged herein constitute violations of the Company's internal policies and charters and cannot be considered a valid exercise of business judgment.  Defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny had a duty to operate this business segment in compliance with all applicable laws.  Defendants' wrongful conduct was continuous and occurred both before and throughout the relevant time period and resulted in ongoing and continuous harm to the Company.

120.     Defendants participated in and/or failed to adequately address, correct, and/or disclose such conduct.  Defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny's challenged misconduct at the heart of this case constitutes an ongoing and continuous scheme to break the law.  As the ultimate decision-making body of the Company, the Discover Board adopted, implemented, condoned a business strategy based on deliberate and widespread illegal activities, and knowingly, or in conscious disregard, chose not to address in a timely manner the improper and illegal conduct identified by the FDIC/CFPB.  The Company generates substantial revenue from its fee-based products like the Plans.  In particular, the Company generated $214 million, $249 million, $295 million, $412.5 million, and $428.2 million in 2007, 2008, 2009, 2010, and 2011, respectively.  Because the Plans are a significant source of revenue, the members of the Board have a duty to understand how the Company's revenue is created and that it complies with applicable law.

121.     Additionally, federal laws and regulations require the Director Defendants to understand their legal and regulatory obligations.  The CFPB states that "[b]oard members should

receive sufficient information to enable them to understand the entity's responsibilities and the commensurate resource requirements" necessary to implement and operate an effective compliance program.

122.    Instead, defendants acted disloyally by causing the Company to use deceptive acts to market such products in order to retain and/or increase profits in the face of substantial new regulations.  Accordingly, any demand upon defendants Nelms, Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny would be futile and is excused.

**Demand Is Excused Because Defendants Bush, Glassmann, Maheras, Moskow and Smith Each Face a Substantial Likelihood of Liability for Their Misconduct as Members of the Audit and Risk Committee.**

123.    Defendants Bush, Glassman, Maheras, Moskow, and Smith (the "Audit and Risk Committee Defendants"), as members of the Audit and Risk Committee, reviewed and approved the Company's enterprise wide risk exposure and compliance with applicable laws, rules, and regulations.[3]  The Audit and Risk Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.   Thus, the Audit and Risk Committee Defendants were responsible for knowingly or recklessly allowing the improper marketing practices related to the Plans.  Further, the Audit and Risk Committee was charged with receiving reports and information from the Company's CEO, General Counsel, the Company's Chief Compliance Officer, the Internal Audit Department, the Corporate Risk Management System, and the Corporate Risk Officer.  Despite their knowledge or conscious disregard of the information discussed above, the Audit and Risk Committee Defendants caused the improper marketing activities to continue.

---

[3]    The Audit and Risk Committee Defendants met 39 times between fiscal years 2008 and 2011. Specifically, the Audit and Risk Committee Defendants met nine times in 2008, 11 times in 2009, eight times in 2010, and 11 times in 2011.

124.    Under the Audit and Risk Committee charter, the Audit and Risk Committee Defendants were, responsible for, among other things: (a) assisting the Board in its oversight of the integrity of the Company's compliance with legal and regulatory requirements; (b) the integrity of the Company's system of internal controls; and (c) the integrity of the Company's risk management. In fact, the Audit Committee Charter specifically sets forth that the Audit and Risk Committee shall take affirmative action when issues arise with respect to the Company's compliance with legal or regulatory requirements.

125.    The Audit and Risk Committee Charter and Company policies also provide the Committee with all of the tools and procedures necessary to meet its obligations.  For example, the Charter states that "[t]he Committee shall have direct access to, and complete and open communication with, the Company's management and internal and independent auditors and may obtain advice and assistance from internal legal, accounting or other advisors."  Moreover, "[t]he Committee may retain independent legal, accounting or other advisors" and "shall have authority to perform or supervise investigations."  The Charter obligates the Company to "provide for appropriate funding, as determined by the Committee, for the payment of expenses related to any such investigation."

126.    In order to carry out their fiduciary obligations to the Company regarding Discover's Compliance with Legal and Regulatory Requirements, the Audit and Risk Committee Defendants are required to "[d]iscuss with management and the independent auditor any material correspondence with regulators or governmental agencies and any external or employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies."

127.    In order to carry out their fiduciary obligations to the Company regarding Discover's Risk Management, the Audit and Risk Committee Defendants are required to: (a) "[r]eview reports

- 38 -

from management on the Company's enterprise-wide risk management program"; (b) "[r]eview with management the framework for assessing and managing the risk exposures of the Company, including credit, market, liquidity *and operational risks*, and the steps management has taken to monitor and control such risk exposures"; (c) "[r]eview reports from management on the status of and changes to risk exposures, policies, procedures and practices"; (d) "[r]eview adequacy of risk parameters that have been established for each area of enterprise risk"; and (e) "[r]eview and discuss with risk management whether it has the appropriate resources, independence and authority to fulfill its responsibilities."

128. As described herein, pursuant to these policies, the Audit and Risk Committee Defendants learned of the deceptive acts and practices described in the Joint Consent Order no later than July 2010 when the Company was named as a defendant in numerous class action lawsuits regarding the deceptive marketing and sale of its fee based add-on products. Moreover, the Audit and Risk Committee would have received reports from defendant Nelms no later than July 2010 (and likely much earlier) because, as Discover's CEO since 1998, defendant Nelms was aware of the issues rampant in the industry regarding deceptive marketing practices. In fact, Discover's risk policies required defendant Nelms, among others, to regularly report to the Audit and Risk Committee Defendants regarding the Company's risk exposure related to Operational and Compliance and Legal Risks.

129. Despite this knowledge, or conscious disregard of such knowledge, the Audit and Risk Committee Defendants allowed the deceptive acts and practices underlying the Joint Consent Order to continue, and did not revise any of the offending operations and/or procedures to ensure that Discover was in compliance with all applicable statutes, rules regulations, and Company policies. Accordingly, the Audit and Risk Committee Defendants each face a substantial likelihood of liability and cannot impartially consider a demand.

- 39 -

130. Thus, the Audit and Risk Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them would be futile because they participated in the wrongdoing described herein.

**Defendant Nelms Is Not Independent**

131. In addition to the foregoing reasons, defendant Nelms is not independent because his principal professional occupation is his employment with Discover, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, Nelms lacks independence from Weinbach, Aronin, Bush, Case, Devlin, Smith, Moskow, Maheras, Glassman, and Lenny due to his interest in maintaining his executive positions at Discover. This lack of independence renders Nelms incapable of impartially considering a demand to commence and vigorously prosecute this action. Discover paid Nelms millions in unjustified payments. Accordingly, Nelms is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Thus, demand is futile as to Nelms.

132. Plaintiffs have not made any demand on shareholders of Discover to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Discover is a publicly traded company with approximately 514 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

- 40 -

## COUNT I

## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

133.    Plaintiffs incorporate ¶¶1-132.

134.    Defendants owed and owe Discover a fiduciary duty of loyalty.  By reason of their fiduciary capacities, defendants owed and owe Discover the highest obligation of good faith and fair dealing.

135.    Defendants, and each of them, violated and breached their fiduciary duty of loyalty. More specifically, defendants violated their duty of loyalty by creating a culture of lawlessness within Discover, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

136.    In the face of a known legal duty to comply with federal and state laws, rules, and regulations, defendants consciously failed to prevent the Company from engaging in the unlawful acts complained of herein and in fact allowed the Company to operate in a manner that the Individual Defendants knew, or consciously disregarded, violated state and federal statutes.

137.    Defendants, as directors of the Company, owed Discover the highest duty of loyalty. Defendants breached their duty of loyalty by consciously disregarding the illegal activity of such substantial magnitude and duration.  In the face of a known duty to comply with federal and state laws, rules, and regulations, defendants consciously failed to prevent the Company from engaging in the unlawful acts complained of herein.

138.    Defendants breached their fiduciary duty of loyalty by failing to properly maintain adequate risk controls during their tenure on the Audit and Risk Committee.  Defendants completely and utterly failed in their duty of oversight as required by the Audit and Risk Committee Charter in effect at the time.

139.    As a direct and proximate result of defendants' breach of loyalty, Discover has been damaged.  As a result of their misconduct, defendants are liable to the Company for damages.

140.    Plaintiffs, on behalf of Discover, have no adequate remedy at law.

## COUNT II

## AGAINST ALL DEFENDANTS FOR CORPORATE WASTE

141.    Plaintiffs incorporate ¶¶1-132.

142.    As a result of the deceptive marketing practices, and by failing to conduct proper supervision, defendants have caused Discover to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

143.    As a result of the waste of corporate assets, defendants are liable to the Company.

144.    Plaintiffs, on behalf of Discover, have no adequate remedy at law.

## COUNT III

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

145.    Plaintiffs incorporate ¶¶1-132.

146.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Discover.  Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Discover.

147.    Plaintiffs, as shareholders and representatives of Discover, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

148.    Plaintiffs, on behalf of Discover, have no adequate remedy at law.

- 42 -

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Discover, demand judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of loyalty, corporate waste, and unjust enrichment;

B.     Directing Discover to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Discover and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(i)     a provision that requires the Audit and Risk Committee to review the Company's marketing practices to ensure compliance with applicable laws, rules, and regulations;

(ii)     a provision that creates an officer level position that is tasked with communicating, complying, and implementing the FDIC's and CFPB's laws, rules, and regulations;

(iii)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(iv)     a provision to permit the shareholders of Discover to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Discover have an effective remedy;

- 43 -

D.     Awarding to Discover restitution from defendants, and each of them, and ordering

disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiffs the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 19, 2013                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             BENNY C. GOODMAN III
                                             ERIK W. LUEDEKE


                                                    s/ Benny C. Goodman III
                                             _____
                                                  BENNY C. GOODMAN III

                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             JAMES E. BARZ (IL Bar # 6255605)
                                             200 South Wacker Drive, 31st Floor
                                             Chicago, IL  60606
                                             Telephone:  312/674-4674
                                             312/674-4676 (fax)

                                             ROBBINS ARROYO LLP
                                             BRIAN J. ROBBINS
                                             GREG DEL GAZIO
                                             600 B Street, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/525-3990
                                             619/525-3991 (fax)

                                             Co-Lead Counsel for Plaintiffs

- 44 -

811155_2

LAW OFFICE OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

VANOVERBEKE MICHAUD
  & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiffs

## VERIFICATION

I, James F. Groen, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Amended Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Corporate Waste, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: *February 18, 2013*

_____
JAMES F. GROEN

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2013, I authorized the electronic filing of the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on February 19, 2013.

s/ Benny C. Goodman III
BENNY C. GOODMAN III

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:bennyg@rgrdlaw.com

# Mailing Information for a Case 1:12-cv-06436

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George Carlos Aguilar**
  gaguilar@robbinsarroyo.com,notice@robbinsarroyo.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com,ldeem@rgrdlaw.com

- **Ashley John Burden**
  ashley.burden@dechert.com,nycmanagingclerks@dechert.com

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **Benny C. Goodman , III**
  bennyg@rgrdlaw.com,e_file_SD@rgrdlaw.com,ldeem@rgrdlaw.com

- **Joni S. Jacobsen**
  joni.jacobsen@dechert.com,nicole.ladue@dechert.com

- **David H. Kistenbroker**
  david.kistenbroker@dechert.com,nycmanagingclerks@dechert.com

- **Angela M. Liu**
  angela.liu@dechert.com

- **Erik W. Luedeke**
  eluedeke@rgrdlaw.com,ldeem@rgrdlaw.com

- **Hille von Rosenvinge Sheppard**
  hsheppard@sidley.com,efilingnotice@sidley.com,labbott@sidley.com

- **Nilofer Ibrahim Umar**
  numar@sidley.com,efilingnotice@sidley.com

- **Carl E. Volz**
  carl.volz@dechert.com,nycmanagingclerks@dechert.com,nicole.ladue@dechert.com

- **Christopher L Walters**
  cwalters@robbinsarroyo.com,notice@robbinsarroyo.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into

your word processing program in order to create notices or labels for these recipients.

**Alfred          G Yates                                                    , Jr**
Attorney at Law
429 Forbes Building
519 Allegheny Building
Pittsburgh, PA 15219