## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE DISCOVER FINANCIAL | ) | No. 12 C 6436 |
| SERVICES DERIVATIVE LITIGATION | ) | |
| | ) | Judge Jorge L. Alonso |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is defendants' motion to dismiss the amended verified consolidated shareholder derivative complaint, which is granted for the following reasons.

### BACKGROUND

Plaintiffs[1] brought this shareholder derivative action on behalf of nominal defendant Discover Financial Services ("Discover") against defendants David W. Nelms, Lawrence A. Weinbach, Jeffrey S. Aronin, Mary K. Bush, Gregory C. Case, Robert M. Devlin, E. Follin Smith, Michael H. Moskow, Thomas G. Maheras, Cynthia A. Glassman, Richard H. Lenny, Philip A. Laskawy, R. Mark Graf, Carlos Minetti, Roy A. Guthrie, Harit Talwar, and Mary Margaret Hastings Georgiadis (collectively, the "Individual Defendants"). Weinbach, Aronin, Bush, Case, Moskow, Maheras, Glassman, and Lenny are current members of Discover's Board of Directors (the "Board"). Nelms is Discover's Chief Executive Officer and a current member of the Board. Devlin and Smith were Board members at the time plaintiffs filed the current complaint but are no longer members. Graf is Chief Financial Officer ("CFO") and Executive

---

[1]The original complaint in this case was filed on August 14, 2012 by James F. Groen. Shortly thereafter, the case was consolidated with 12 C 6883, which was filed by Charter Township of Clinton Police and Fire Retirement System ("Clinton Township") against the same defendants. After Mr. Groen and Clinton Township filed the operative complaint on February 19, 2013, Mr. Groen passed away. On February 18, 2015, the Court granted an unopposed motion to substitute for Mr. Groen plaintiff Jeanette Bokhari, who is the executor of Mr. Groen's estate and trustee of his Trust. Plaintiffs are citizens of Michigan.

Vice President.  (R. 63, Am. V. Consol. S'holder Deriv. Compl. (hereinafter "Compl.") ¶ 29.)  Minetti is "Executive Vice President, President - Consumer Banking and Operations."  (*Id.* ¶ 30.)  Talwar serves as "Executive Vice President, President - US Cards."  (*Id.* ¶ 32.)  Guthrie served as CFO, Chief Accounting Officer, and Executive Vice President from 2005 to April 2011.  (*Id.* ¶ 31.)   Georgiadis was Executive Vice President and Chief Marketing Officer from 2004 to July 2008.  (*Id.* ¶ 33.)  The Board has an Audit and Risk Committee, which included defendants Bush, Smith, Moskow, Maheras, Glassman, and Laskawy during the period of alleged wrongful conduct (between 2007 and 2011).  (*Id.* ¶¶ 2, 20, 23, 24, 25, 26, 28, 48.)[2]

Discover, which is a Delaware corporation with a principal place of business in Illinois, offers credit cards, student loans, personal loans, and deposit products through its wholly-owned subsidiaries, Discover Bank and Discover Home Loans, Inc.  In connection with its credit card business, Discover offers a variety of fee-based add-on products such as "Payment Protection, Identity Theft Protection, Wallet Protection, [and] Credit Score Tracker" (collectively, the "Products").  (*Id.* ¶ 16.)  The Products "purported to offer Discover credit card holders financial protection against hardships such as job loss, sickness, identity theft, lost wallets, and low credit scores."  (*Id.* ¶ 2.)

Plaintiffs' claims arise out of Discover Bank's marketing of the Products.  On September 24, 2012, Discover announced that Discover Bank (the "Bank") had entered into a Joint Consent Order with the Federal Deposit Insurance Corporation ("FDIC") and Consumer Financial

---

[2]Although the complaint alleges that Laskawy served on the Audit and Risk Committee, (Compl. ¶¶ 28, 48), plaintiffs do not include Laskawy with the other five Committee members as one of the named "Audit and Risk Committee Defendants," who allegedly face a substantial likelihood of liability because they allowed the allegedly deceptive acts and practices to continue. (*Id.* ¶¶ 123, 129-30).

Protection Bureau ("CFPB") to resolve a federal regulatory investigation.  (*Id.* ¶ 3; R. 69-5, Defs.' Mem. in Supp. of Mot. to Dismiss, Ex. E, Jt. Consent Order 1.)[3]  The Joint Consent Order states that the FDIC and CFPB determined that the Bank had engaged in deceptive acts and practices in connection with the marketing, sales, and operation of the Products and that the FDIC determined that the Bank had engaged in unsafe or unsound banking practices.  (Jt. Consent Order 1-2.)  According to the Joint Consent Order, during the period from December 1, 2007 through August 31, 2011, the Bank had engaged in telemarketing of the Products to its credit card holders through both outbound sales calls and inbound customer service calls, using telemarketing scripts that contained various misrepresentations and omissions that were likely to mislead reasonable consumers about whether they were purchasing one of the Products.  (*Id.* at 2-3.)  The scripts included statements that misleadingly implied that a Product was a free "benefit" rather than something for which a card holder would be charged an additional fee; omitted the fact that "enrollment" constituted an agreement to purchase a Product; solicited interest in "enrollment" before providing a Product's price or terms and conditions; and failed to disclose that certain individuals would be unable to obtain certain benefits of a Product.  (*Id.* at 3-5.)  The Joint Consent Order also notes that the "impact of Discover's deceptive telemarketing scripts and presentations was compounded by the fact that Discover did not need to ask

---

[3]Defendants have attached to the memorandum in support of their motion six exhibits, including the Joint Consent Order, various of Discover's SEC filings, and Discover's Delaware Amended and Restated Certificate of Incorporation.  (R. 69, Defs.' Mem. in Supp. of Mot. to Dismiss, Exs. A-F.)  Plaintiffs do not object to the Court's considering any of the six exhibits.  The Court may consider all of them because they are public records.  On a motion to dismiss, a court may consider the allegations of the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice, such as public records.  *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639-40 (7th Cir. 2008).  In addition to being a public record, the Joint Consent Order is referred to in and central to the complaint.

3

Cardmembers for their credit card numbers in order to bill them for the Products because it had access" to those numbers and could (and did) directly bill the cost of the Products to card holders' accounts. (*Id.* at 4.) The Bank did not admit (or deny) the FDIC and CFPB's findings and conclusions of law or that it had violated any laws, (*id.* at 2), but it agreed to implement several corrective actions, compliance management and audit systems, internal controls, an oversight committee, and recordkeeping requirements; make progress reports; and notify shareholders. The Bank also agreed to pay a $14 million civil penalty and $200 million in restitution to customers affected by its practices. (*Id.* at 21-28.)

The complaint alleges that the Individual Defendants "made the conscious decision to operate Discover with unlawful sales, marketing and billing practices, despite being put on notice of the illegality of such practices through prior actions against its competitors for similar practices, lawsuits/investigations against Discover, regulatory investigations into Discover's practices, and government activity concerning these matters." (*Id.* ¶ 7.) It is further alleged that "defendants' faithless acts have resulted in a class action lawsuit for violation of the federal securities laws, which recently settled for $10.5 million" and that a number of Attorneys General have filed lawsuits against Discover based on the same deceptive marketing practices described in the Joint Consent Order. (*Id.* ¶ 6.) The complaint contains three counts: breach of fiduciary duty (Count I); corporate waste (Count II); and unjust enrichment (Count III).

Plaintiffs did not file a pre-suit demand with Discover asking the directors to initiate this action against themselves (on behalf of the corporation). The complaint states that they skipped this step because "such a demand would be a futile and useless act." (*Id.* ¶ 111.) All defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 23.1 for failure to adequately plead demand futility. The Individual Defendants also move to dismiss the

4

complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).[4]

## DISCUSSION

### A.   Legal Standards

For purposes of the instant motion, the Court accepts as true the well-pleaded facts of the complaint. *See In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003). Federal Rule of Civil Procedure 23.1 requires a plaintiff in a shareholder derivative action to "state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Although federal law governs the degree of detail that the plaintiff must furnish when it provides its reasons for not obtaining the action or not making the effort, state law determines whether "the content of the statement suffices to permit the shareholder to proceed with the litigation." *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 722, 725 (7th Cir. 2013). The law of the state of incorporation of the subject corporation governs the demand-futility question. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90,  98-99, 108-09 (1991); *see also Abbott Labs.*, 325 F.3d at 803 ("Because Abbott was incorporated under the laws of Illinois, Illinois law applies in determining whether a demand may be excused when shareholders file a derivative complaint on behalf of the company."). The parties agree that because Discover is incorporated in Delaware, Delaware law applies. (Defs.' Mem. 10 n.6; R. 73, Pl.'s Opp'n 6.)

---

[4]Defendants request oral argument on their motion.  The request is denied because the briefs adequately present the issues and oral argument will not materially add to the Court's understanding.

"In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim.  Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf."  *Gordon v. Goodyear*, No. 12 C 369, 2012 WL 2885695, at *5 (N.D. Ill. July 13, 2012) (internal quotation marks omitted).  Under Delaware law, "[t]he directors of a corporation and not its shareholders manage the business and affairs of the corporation, and accordingly, the directors are responsible for deciding whether to engage in derivative litigation."  *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991) (citation omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  "By its very nature the derivative action impinges on the managerial freedom of directors."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d 244.  "Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation."  *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) (citation omitted); *see also Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).  The demand requirement is "more than a mere pleading requirement; it is a substantive right."  *Starrels v. First Nat'l Bank of Chicago*, 870 F.2d 1168, 1171 (7th Cir. 1989) (citing *Aronson*, 473 A.2d at 809).

Delaware uses two tests for demand futility.  The first test arises from *Aronson*, 473 A.2d at 814, and "applies to claims involving a contested transaction, *i.e.*, where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties."  *Wood v.*

6

*Baum*, 953 A.2d 136, 140 (Del. 2008). *Aronson* requires the plaintiff to "allege particularized facts creating a reason to doubt that (1) the directors are disinterested and independent or that (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* (internal quotation marks and brackets omitted) (citing *Aronson*, 473 A.2d at 814). "The test is in the disjunctive: if either prong is satisfied, demand is excused." *Westmoreland*, 727 F.3d at 725 (internal quotation marks and brackets omitted) (quoting *Brehm*, 746 A.2d at 256). The second test is set forth in *Rales* and "applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties." *Wood*, 953 A.2d at 140. Under the *Rales* test, a plaintiff must "allege particularized facts establishing a reason to doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* (internal quotation marks omitted) (citing *Rales*, 634 A.2d at 934). The proper inquiry under either test is whether plaintiffs have made a sufficient "threshold showing, through the allegation of particularized facts," that their claims have some merit. *See Westmoreland*, 727 F.3d at 729 (citing *Rales*, 634 A.2d at 934).

If a company's articles of incorporation include an exculpatory provision that immunizes directors from liability for a breach of the duty of care, a plaintiff must also plead particularized facts that create reason to doubt that a majority of the board upheld their duty of loyalty by acting in good faith. *Stone v. Ritter*, 911 A.2d 362, 370, 373 (Del. 2006). To satisfy this burden, a plaintiff must sufficiently allege that the directors intentionally acted against the corporation's interests, willfully violated the law, or intentionally failed to act in the fact of a known duty to act, thus demonstrating a conscious disregard for their duties. *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006); *In re Biosante Pharm., Inc. Deriv. Litig.*, 968 F. Supp. 2d

940, 947 (N.D. Ill. 2013); *In re Abbott Depakote S'holder Deriv. Litig.*, 909 F. Supp. 2d 984, 993 (N.D. Ill. 2012) [hereinafter *Depakote I*].

Attached to defendants' motion is Discover's "Amended and Restated Certificate of Incorporation," dated June 28, 2007, which includes a provision exculpating Discover's directors from liability for monetary damages for breach of fiduciary duty, except (1) for breach of the duty of loyalty; (2) for bad-faith acts or omissions, intentional misconduct, or a knowing violation of law; (3) under Delaware's General Corporation Law Section 174;[5] and (4) for any transaction from which the director derived an improper personal benefit.  (Defs.' Mem., Ex. C, art. 9, at 6.)  The last two exceptions are not relevant here.  Accordingly, plaintiffs must plead with particularity that Discover's directors breached their duty of loyalty, knowingly violated the law, or engaged in bad-faith or intentional misconduct.

Plaintiffs allege that the Individual Defendants "made the conscious decision to operate Discover with unlawful, sales, marketing and billing practices, despite being put on notice of the illegality of such practices" (Compl. ¶ 7); "breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, [Discover] to violate applicable law" (*id.* ¶ 34); consciously failed to comply with their duties, resulting in a breach of the duty of loyalty (*id.* ¶ 38); knowingly or with conscious disregard "did nothing to stop" Discover's "illegal conduct" (*id.* ¶¶ 103, 106); "creat[ed] a culture of lawlessness" (*id.* ¶ 135); and "consciously failed to prevent" Discover from engaging in unlawful acts (*id.* ¶¶ 135-36). Plaintiffs further allege that the directors "consciously disregard[ed]  the illegal activity of such substantial magnitude and duration" (*id.* ¶ 137), and that the members of the Audit and Risk

---

[5]This provision creates director liability for unlawful payment of dividends or unlawful stock purchase or redemption.  Del. Code Ann. tit. 8, § 174(a).

Committee failed to properly maintain adequate risk controls during their tenure on the Committee (*id.* ¶ 138).

Defendants contend that the Court should apply the *Rales* standard because plaintiffs' claims lack the "essential predicate" for the *Aronson* standard—"action by the Board of Directors." (Defs.' Mem. 12 (emphasis omitted).) Plaintiffs discuss the two tests generally and do not expressly specify which one they believe applies. Through the structure of their principal brief, they implicitly invoke *Aronson*, but present arguments under both tests, asserting that the Board's actions were not a valid exercise of business judgment (relevant for *Aronson*) and that a majority of the Board is unable to disinterestedly or independently consider a demand (relevant for *Aronson* and *Rales*). Plaintiffs observe, however, that "[a]t bottom, both the *Aronson* and *Rales* tests simply ask whether 'the directors are incapable of making an impartial decision regarding [the proposed] litigation.'" (Pls.' Opp'n 7 n.6.) Defendants likewise contend that the choice is "largely academic" because under either standard, plaintiffs must plead bad faith with particularity. (Defs.' Mem. 12; R. 77, Defs.' Reply 3.) Plaintiffs do not disagree, and indeed, their complaint cites *Stone*, 911 A.2d at 370, for the proposition that "where corporate fiduciaries fail to act in the face of a known legal duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." (Compl. ¶ 37.)

*Aronson* does not seem to apply here because, although plaintiffs allege that the Individual Defendants had actual knowledge of wrongdoing and "consciously" decided not to act, their allegations of knowledge and any conscious decisions are conclusory, as discussed

below.[6]  *See In re Bidz.com Deriv. Litig.*, No. CV 09-4984 PSG (Ex), 2010 WL 1727703, at *4 n.4 (C.D. Cal. Apr. 27, 2010) ("Allegations that the Board 'consciously' decided not to act, without more, does not transform the Board's failure to exercise proper oversight into an affirmative 'decision.' . . . [A]ny 'failure to act' could be transformed into a 'decision' to avoid the *Rales* test.").  Nonetheless, the Court need not choose between *Aronson* and *Rales*, for even if the Court employs the two-part *Aronson* test, here its prongs (the first of which constitutes the *Rales* test) merge into an analysis of bad faith, as will become apparent in the discussion below.

**B.    Demand Futility**

A plaintiff adequately alleges demand futility under *Rales* and the first *Aronson* prong where there is reason to doubt that a majority of the directors lack disinterestedness or independence.  *See Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).  "[I]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."  *Rales*, 634 A.2d at 936.

Plaintiffs allege that Nelms, as Discover's CEO, is non-independent because "his principal professional occupation is his employment with Discover, pursuant to which he has received and continues to receive substantial monetary compensation" and because he has an interest in maintaining that occupation and compensation.  (Compl. ¶ 131.)  According to plaintiffs, Nelms has received more than $25 million in "unjustified payments" from Discover ("unjustified" on the theory that Discover should not have paid compensation and bonuses to

---

[6]In support of their suggestion that *Aronson* is the applicable test, plaintiffs cite, *inter alia*, *Abbott Labs.*, 325 F.3d at 809.  (Pls.' Opp'n 10.)  In *Abbott Labs.*, the Seventh Circuit applied *Aronson* where the allegations were sufficient for the Court to infer that the board knew of the problems and decided no action was required.  325 F.3d at 806.  *Abbott Labs.* is distinguishable; as discussed below in greater detail, the well-pleaded factual allegations in the instant complaint do not allow the Court to reasonably infer that the Board made a conscious decision not to act.

officers and directors who breached their fiduciary duty). (*Id.* ¶¶ 17, 142.) The Court concludes that plaintiffs therefore have alleged particularized facts sufficient to create a reasonable doubt that Nelms can act independently. *See Rales*, 634 A.2d at 937 (concluding that the complaint sufficiently created reasonable doubt that the CEO/director was independent where he received a large salary from the company); *Marvin H. Maurras Revocable Trust v. Bronfman*, Nos. 12 C 3395 & 12 C 6019, 2013 WL 5348357, at *18 (N.D. Ill. Sept. 24, 2013) ("assuming" that the company's president and CEO lacked independence) (citing *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at *7 (Del. Ch. Oct. 12, 2011)). Plaintiffs do not even attempt to plead or argue that the other directors lack independence, so the Court will proceed to analyze whether plaintiffs have adequately alleged facts that create a reasonable doubt that enough of the other directors to constitute a majority were disinterested.

Plaintiffs contend that the director defendants lack disinterestedness because they face a substantial likelihood of personal liability for the misconduct alleged in this action. (Pls.' Opp'n 8 (citing *Ryan*, 918 A.2d at 355).) Under Delaware law, the "mere threat" of personal liability, "standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Aronson*, 473 A.2d at 815; *see also Zucker v. Andreessen*, C.A. No. 6014-VCP, 2012 WL 2366448, at *10 (Del. Ch. June 21, 2012). Courts will excuse demand under this prong of *Aronson* only in "rare cases" where a transaction is "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815. Where, as here, directors are exculpated from liability except for intentional, knowing, or bad-faith misconduct, a plaintiff must plead particularized facts "that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood*, 953 A.2d at

11

141; *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501-02 (Del. Ch. 2000) (to state a claim premised on behavior not immunized by an exculpatory provision, a plaintiff must allege facts that would "buttress a conclusion" that the director defendants engaged in "bad faith, self-interested, or other intentional misconduct rising to the level of a breach of the duty of loyalty").

It becomes apparent here that whether the Court employs *Rales* or *Aronson*, it arrives at an analysis of bad faith. The second *Aronson* prong involves the business judgment rule, which "establishes 'a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Westmoreland*, 727 F.3d at 725 (quoting *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009)). The rule affords no protection, though, "[i]f a director breaches the fiduciary duty of loyalty—which requires 'conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (*i.e.*, gross negligence)' . . . ." *Id.* (quoting *Stone*, 911 A.2d at 367). "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith. Or, put slightly differently, the intentional dereliction of duty or the conscious disregard for one's responsibilities constitutes bad faith conduct, which results in a breach of the duty of loyalty." *Id.* at 725-26 (citations and internal quotation marks and brackets omitted). Thus, here the question of demand futility under either test turns on whether plaintiffs have pleaded enough to show with the necessary particularity how, in their view, the Board acted in bad faith such that they breached their duty of loyalty to Discover.

Defendants argue that plaintiffs fail to allege with particularity that the directors knew about any wrongdoing or that they allowed wrongdoing to continue unaddressed. Plaintiffs maintain that they have pleaded facts indicating that "defendants implemented and/or condoned a business strategy based on deliberate and widespread illegal activities, and knowingly, or in conscious disregard, chose not [to] address in a timely manner the improper and illegal conduct identified by the FDIC and CFPB." (Pls.' Opp'n 22 n.18.) Plaintiffs have failed to include any particularized allegations that suggest that the directors intentionally implemented a deceptive business strategy or actively caused Discover to engage in deceptive marketing practices or violate any laws, so the Court will focus on the allegations that the Board knew about and "condoned" the alleged deceptive practices.

The complaint recites what plaintiffs deem to be a "prolonged onslaught" of "warnings regarding the illegality associated with Discover's [marketing] practices." (Pls.' Opp'n 10, 17.) To assess these purported warnings, it is important to understand the time frame of events. Plaintiffs allege that the "Relevant Period" is "[b]etween 2007 and 2011."[7] (Compl. ¶ 2.) Regarding particularized allegations of notice to the Board of any wrongdoing, however, the alleged time period is much narrower. Plaintiffs allege in the complaint, (*id.* ¶ 113), and argue in their brief that the Board "had direct notice that Discover was engaging in illegal practices in relation to [the Products] no later than July 8, 2010," when the first class-action suit was filed against Discover, the Bank, and their affiliates, (Pls.' Opp'n at 11). The complaint relies on

---

[7]Aside from Nelms, none of the director defendants began serving on the Board prior to June 2007.

allegations about Discover's internal controls and Audit Committee, coupled with the alleged warnings of wrongdoing within Discover.[8]

### 1. Discover's Internal Controls and Audit Committee

Plaintiffs devote a portion of their complaint to allegations concerning the Individual Defendants' duties under the Consumer Financial Protection Act and Federal Deposit Insurance Act, (Compl. ¶¶ 39-43), and under Discover's own policies, Code of Ethics and Business Conduct, and committee charters, (*id.* ¶¶ 44-56, 119, 121, 123-130.) Plaintiffs allege that the Board met 37 times between fiscal year 2008 and 2011 (9 times in 2008, 10 times in 2009, 8 times in 2010, and 10 times in 2011). (*Id.* ¶ 111 & n.2.) Plaintiffs also allege that the Products "generated $214 million, $249 million, $295 million, $412.5 million, and $428.2 million [in revenue] in 2007, 2008, 2009, 2010, and 2011, respectively," for Discover and that because the Products are a "significant source of revenue, the members of the Board have a duty to

---

[8]Also included in the complaint is a set of allegations, (Compl. ¶¶ 98-105), about "a series of investigations into similar illegal and improper practices in the industry" and "other companies in the industry" that "have been investigated, fined, and sued for violations similar to those engaged in by Discover," as well as "increased government regulation and regulatory activity in the area of marketing and sales for credit card product and consumer protection." (*Id.* ¶¶ 98, 103.) In their brief, plaintiffs abandon their reliance on these allegations, which appear to be designed to stretch the complaint to cover a longer time span and are fruitless in any event. Allegations about other companies and general industry regulation are insufficient to support an inference that the director defendants knew or should have known about deceptive marketing practices occurring at Discover. *See, e.g., Depakote I*, 909 F. Supp. 2d at 999 (finding that allegations that the pharmaceutical industry had been the focus of investigations relating to off-label marketing were insufficient to establish that Abbott's Board was aware, or should have been aware, that Abbott employees were marketing Depakote for off-label uses); *Brautigam v. Rubin*, No. 11-CV-2693 (TPG), 2014 WL 4809939, at *6-7 (S.D.N.Y. Sept. 24, 2014) (rejecting, as "red flags" sufficient to show that the Board consciously failed to respond to unlawful mortgage-servicing practices, general guidance issued by government agencies and industry-wide communications not specifically directed at the subject company). Plaintiffs also fail to discuss their allegation about unrelated class-action lawsuits and an FCC citation for violation of the Telephone Consumer Protection Act. (Compl. ¶ 97.)

understand how [Discover's] revenue is created and that it complies with applicable law." (*Id.* ¶¶ 61, 120.) Furthermore, plaintiffs allege that defendants Bush, Smith, Moskow, Maheras, and Glassman, as members of the Board's Audit and Risk Committee, were responsible for reviewing various aspects of risk management, including discussing with management and independent auditors any material correspondence with regulators or governmental agencies and any external complaints or published reports that raise material issues regarding Discover's financial statements or accounting policies. (*Id.* ¶¶ 123-128.) The Audit and Risk Committee defendants met 39 times between fiscal years 2008 and 2011 (9 times in 2008, 11 times in 2009, 8 times in 2010, and 11 times in 2011). (*Id.* ¶ 123 n.3.)

Plaintiffs submit that "[a]ssuming that [Discover's] corporate governance structure worked (which defendants do not dispute), it is entirely reasonable to infer that each Discover director was aware of" ongoing wrongdoing. (Pls.' Opp'n 14.) Defendants argue that pleading the existence of compliance mechanisms is insufficient to establish the requisite knowledge or awareness. (Defs.' Mem. 21.) The Court agrees. Plaintiffs' suggestion that Discover's internal controls themselves establish that the Board must have had knowledge of continuing wrongful conduct relating to the marketing of the Products is contrary to law. Allegations of a company's internal controls or the directors' responsibilities or statutory duties by themselves are insufficient to establish the directors' bad faith. *Brautigam v. Rubin*, No. 11-CV-2693 (TPG), 2014 WL 4809939, at *6 (S.D.N.Y. Sept. 24, 2014); *Depakote I*, 909 F. Supp. 2d at 996-97; *In re Goldman Sachs Mortg. Servicing S'holder Deriv. Litig.*, --- F. Supp. 3d -----, No. 11 Civ. 4544 (WHP), 2012 WL 3293506, at *6-7 (S.D.N.Y. Aug. 14, 2012); *Bidz.com*, 2010 WL 1727703, at *9 (citing *In re Computer Scis. Corp. Deriv. Litig.*, No. CV 06-05288 MRP (Ex), 2007 WL 1321715, at *6 (C.D. Cal. Mar. 26, 2007)). Committee membership is also an

insufficient basis on which to infer knowledge. *Wood*, 953 A.2d at 142-43; *Desimone v. Barrows*, 924 A.2d 908, 942 (Del. Ch. 2007); *Goldman Sachs*, 2012 WL 3293506, at *7; *Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 811 (D. Minn. 2009); *Ji v. Van Heyningen*, No. CA 05–273 ML, 2006 WL 2521440, at *12 (D.R.I. Aug. 29, 2006) ("[I]mputing knowledge to a director by virtue of his or her position alone is insufficient for demand excuse purposes."). Instead, a plaintiff must point to specific warning signs that are so prominent that the defendants must necessarily have examined and considered them in the course of their duties as directors and/or committee members. *Brautigam*, 2014 WL 4809939, at *6; *Goldman Sachs*, 2012 WL 3293506, at *6-7.

### 2. Lawsuits and Government Investigations

The warning signs that plaintiffs rely upon consist of lawsuits and government investigations. The complaint alleges that in addition to the investigation that gave rise to the Joint Consent Order, eight class action lawsuits were filed in federal district courts across the country from July 2010 to March 2011 that claimed that Discover's marketing of its "Payment Protection" product violated the Truth in Lending Act and various state laws. (Compl. ¶¶ 87-88.) The Judicial Panel on Multidistrict Litigation consolidated the cases and transferred them to the Northern District of Illinois. (*Id.* ¶ 87.) In June 2011, the parties entered into a preliminary global settlement of all the class actions, which was approved on November 9, 2011. Final approval of the settlement, which was for $10.5 million and an additional $3.5 million in attorneys' fees, was granted on May 10, 2012. (*Id.* ¶ 89.)

Plaintiffs also allege that various state Attorneys General filed lawsuits or began investigations regarding Discover's marketing and administration of various fee-based products. These actions were filed by the Minnesota Attorney General in December 2010; the Attorney

General of West Virginia in August 2011; the Attorney General of Hawaii in April 2012; and the Attorney General of Mississippi in June 2012. (*Id.* ¶¶ 90, 92, 94, 96.) In November 2011, Discover agreed to a consent judgment to pay $2 million to settle the Minnesota action. (*Id.* ¶ 94.) Plaintiffs allege that the Minnesota action was "widely reported" by the media and that the *Wall Street Journal* reported in December 2010 that the suit was "the latest effort by authorities to rein in credit-card companies that are pumping up their profits by selling fraud-protection and other credit-related products to customers." (*Id.* ¶ 95.) Moreover, the Attorney General of Missouri in August 2011 requested information from Discover in connection with an investigation of Payment Protection marketing. (*Id.* ¶ 91.) Plaintiffs contend that these proceedings constitute "repeated warnings" that permit the inference that the director defendants knew or should have known no later than July 2010 that Discover "was engaging in illegal practices," yet they "allowed Discover Bank to continue its deceptive practices for more than a year, or until August 31, 2011, the end of the period applicable to the Joint Consent Order." (Pls.' Opp'n 10-11.)

The existence of these proceedings and settlements is not enough to allow the Court to conclude that there is a reasonable possibility that the directors acted in bad faith. Plaintiffs' contention that there was a "prolonged onslaught" of warnings is belied by the timing of the proceedings. The class actions, the matters brought by Attorneys General, and the FDIC/CFPB action all occurred during the same relatively short period of time. The earliest class-action suit was filed in July 2010, and the earliest of the matters brought by Attorneys General was filed in December 2010. The Joint Consent Order reflects 2011 FDIC docket numbers and a 2012 CFPB docket number. These proceedings were not initiated over a span of years, but over a span of months, and some of them were initiated after the "relevant period" set out in the complaint.

17

And plaintiffs do not allege that any of the proceedings resulted in a finding of liability or admission of wrongdoing. (In fact, as noted above, the Joint Consent Order provided that Discover Bank did not admit the agencies' findings of fact.)

It is true that plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged. *See Brehm*, 746 A.2d at 255. Therefore, the agencies' finding in the Joint Consent Order that Discover's misconduct continued through August 2011 makes plausible plaintiffs' allegations that the alleged deceptive marketing did in fact continue through that date. But plaintiffs fail to explain why it can be reasonably inferred that the Board knew of and consciously chose not to remedy any ongoing improper conduct that occurred during the short time frame between July 2010 and August 2011. Discover agreed to settle the consolidated class actions in June 2011, just prior to the end of that time frame, and the Minnesota Attorney General action after the end of that time frame, in November 2011. Even if the Court could infer from Discover's system of internal controls that the Board knew about these overlapping lawsuits and investigations, they would demonstrate that the Board knew about possible prior violations of law, but do not allow a reasonable inference that the Board knew about ongoing violations and condoned them. *See, e.g.*, *Maurras Trust*, 2013 WL 5348357, at *6 (refusing to infer from allegations of settlements in FDCPA lawsuits that the board possessed the requisite intent or knowledge of ongoing violations for demand-futility purposes) (citing, *inter alia*, *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009) (holding that even where there was evidence that the directors knew of ongoing investigations into Intel's alleged anticompetitive business practices, that alone did not permit an inference that the directors had constructive knowledge)); *In re Corinthian Colls., Inc. S'holder Deriv. Litig.*, No. SA CV 10-1597-GHK (PJWx), 2012 WL 8502955, at *8-9 (C.D. Cal. Jan. 30,

2012) (finding that allegations of "numerous government investigations," the payment of "millions of dollars in settlements and refunds," and a settlement in a proceeding brought by the California Attorney General in regard to the company's illegal recruiting, marketing, and administrative practices at certain campuses were insufficient to support an inference that the directors knew of alleged widespread deceptive recruiting practices throughout the company); *In re ITT Corp. Deriv. Litig.*, 588 F. Supp. 2d 502, 512-13 (S.D.N.Y. 2008) ("While the 2001 Government investigation and the 2004 consent decree would certainly seem sufficient to put the Directors on notice as to possible misconduct at ITT, without any information regarding the individual Directors' responses, if any, to those events, the Court cannot say whether the Directors failed to act or if the actions they took were inappropriate in light of the information they received. That those steps proved to be insufficient to prevent the continuance of criminal conduct does not itself establish conscious disregard of fiduciary duties."); *McSparran v. Larson*, Nos. 04 C 41 & 04 C 4778, 2006 WL 2052057, at *5 (N.D. Ill. May 3, 2006) (finding that allegations about civil lawsuits and an SEC investigation were insufficient to establish that a majority of the directors faced a substantial likelihood of liability and noting that "[n]ot every lawsuit means a board was negligent in its oversight and not every government investigation means a company's board must relinquish control over litigation on behalf of the corporation.").

Plaintiffs fail to provide any particularized allegations about what the director defendants actually knew about the lawsuits and governmental investigations or what they did or failed to do in response to them. The allegations about the number of times that the Board and Audit Committee met during the relevant period do not add anything of substance to the complaint because there are no allegations about what the director defendants discussed at the meetings or the contents of the reports and information they received.

19

In support of their contention that their complaint passes muster, plaintiffs rely upon several decisions, all of which are distinguishable because they involved particularized allegations of knowledge and/or a more compelling collection of alleged warnings that occurred over a much longer time span. In *Abbott Labs.*, the complaint alleged that the board failed to take appropriate action in the face of thirteen separate FDA inspections (some of which lasted two months or longer) of Abbott's manufacturing facilities over a period of six years; four FDA Warning Letters; Abbott having agreed with the FDA to implement a Voluntary Compliance Plan; the FDA having met at least ten times with Abbott representatives, including the CEO and other senior officers, about the continuing violations; the FDA "closing out" the Voluntary Compliance Plan after two and a half years when Abbott had failed to abide by it; Abbott issuing a press release about the FDA's notification of non-compliance; and the FDA filing a complaint for injunctive relief. *See* 325 F.3d at 798-803, 808. The Court of Appeals held that these facts collectively implied the board's "knowledge of long-term violations" and its decision that "no action was required." *Id.* at 806.

Likewise, *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), is inapposite. The complaint in *Pfizer* alleged that the board had "intentionally approved or deliberately disregarded Pfizer's alleged promotion of off-label drugs and its payment of alleged illegal kickbacks to health care professionals." *Id.* at 455. Plaintiffs alleged that the board had received reports of a 2004 settlement with the government for its subsidiary's off-label marketing, pursuant to which the company had agreed to pay a $240 million criminal fine and an additional $190 million penalty and to abide by a corporate integrity agreement ("CIA"); a 2007 settlement with the government for off-label marketing, pursuant to which the company had agreed to pay another $34.6 million in criminal fines; a "large number"

20

of FDA violation notices and warning letters; "several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing"; and allegations about *qui tam* lawsuits. *Id.* at 455-56, 460. The board had received many of these reports during the time that it was obligated by 2002 and 2004 CIAs to pay special attention to such problems. *Id.* at 460-61. The court held that plaintiffs had pleaded with sufficient particularity that a majority of directors faced a substantial likelihood of personal liability because they deliberately disregarded reports of the company's pervasive illegal marketing practices, which eventually resulted in a $2.3 billion settlement with the government in 2009 for illegal marketing of drugs. *Id.* at 457, 462.

*In re Veeco Instruments, Inc. Securities Litigation*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006), another decision relied upon by plaintiffs, is also distinguishable. There, the plaintiffs alleged that board members had consciously permitted the corporation to violate federal export control laws, that "a single violation of federal export laws can lead to fines and suspension of export privileges," and that approximately seventy percent of the corporation's revenues were derived from export sales. *Id.* at 278. The complaint included particularized allegations that the Audit Committee was aware of and had failed to respond to two reports made seven months apart by an employee/whistleblower concerning violations of federal export control laws and an internal audit—prompted by the employee's report—that caused the company to conclude that it had violated export laws on at least nine other occasions. *Id.* at 272, 277-78.

After the parties filed their main briefs on the instant motion, they filed supplemental briefs and responses addressing later decisions. In those supplemental briefs, plaintiffs rely on two additional decisions. These decisions, like *Abbott Labs.*, *Pfizer*, and *Veeco*, are factually distinguishable. The first is *In re Abbott Depakote Shareholder Derivative Litigation*, No. 11 C

8114, 2013 WL 2451152 (N.D. Ill. June 5, 2013) [hereinafter *Depakote II*].[9]  The complaint in *Depakote II* alleged that Abbott had engaged in an eleven-year scheme to illegally market off-label use of Depakote and pay illegal kickbacks to physicians to prescribe and promote Depakote.  It included specific, particularized allegations that Abbott had entered into a prior settlement for off-label marketing that included a $600 million payment and implementation of a five-year CIA with additional compliance policies and internal controls; the board had ignored a Department of Justice ("DOJ") letter that informed Abbott that the DOJ was investigating the marketing of Depakote and instructed Abbott to preserve records; and Abbott had received subsequent related subpoenas directing Abbott to collect responsive information from its employees, including officers and directors.  2013 WL 2451152, at *3, 7-11.

The second case plaintiffs rely upon in their supplemental briefing is *Westmoreland*, 727 F.3d 719.  *Westmoreland* is distinguishable because it involved misconduct that went on for several years even after the subject company, Baxter International, Inc. had entered into a 2006 FDA consent decree.  Plaintiff alleged that Baxter's directors and officers breached their fiduciary duties by consciously disregarding their responsibility to bring Baxter into compliance with the consent decree.  The Court of Appeals held that plaintiff satisfied the demand-futility requirement where it alleged that in late 2008, the company "dramatically cut" the amount its was spending on remedial efforts and the director defendants made a conscious decision to halt those efforts despite having received repeated letters from the FDA containing warnings that Baxter's remedial efforts were insufficient.  *Id.* at 728-29.  The plaintiffs alleged that the repeated warnings from the FDA were directly communicated to Baxter's CEO and passed along

---

[9]Plaintiffs also cite in supplemental briefing an opinion in which the court denied a motion to reconsider *Depakote II*.  (R. 89.)

to the board and that the directors were "regularly apprised of" ongoing dialogue with the FDA and meetings with FDA officials concerning proposed remediation plans. *Id.* at 722, 726. The complaint alleged particularized facts, including meeting dates and minutes, indicating that the directors "were intimately involved in overseeing the remedial effort." *Id.* at 728.

Plaintiffs' conclusory references to a "four-year illicit scheme" aside, (Pls.' Opp'n 17), the alleged warning signs in this action do not even begin to approach the magnitude and/or duration of the wrongdoing that was alleged in the decisions plaintiffs rely upon. During the time the Discover Board is alleged to have breached its duty of loyalty, there had been no determination, external or internal, that Discover had engaged in wrongdoing. Furthermore, Discover was not operating under any consent decree or compliance plan or with a history of having employed deceptive marketing. It is significant that plaintiffs do not allege that the Individual Defendants engaged in any misconduct after the Joint Consent Order was issued, or even for the year prior to its issuance. Plaintiffs themselves confine the directors' alleged wrongdoing to a period of just over one year[10], but their complaint fails to set out particularized facts that allow the Court to infer that during that time, the Board intentionally permitted or consciously disregarded any illegal marketing of the Products.

Under Delaware's demand-futility law, plaintiffs' allegations, even considered collectively, are insufficient to establish demand futility. The complaint essentially equates a bad outcome with bad faith, a pleading method that the Supreme Court of Delaware has rejected

---

[10]Plaintiffs contend that Discover's Board "had direct notice that Discover was engaging in illegal practices in relation to its add-on products division no later than July 8, 2010, . . . [y]et rather than take steps to stop the violations of law, the Director Defendants allowed Discover Bank to continue its deceptive practices for more than a year, or until August 31, 2011, the end of the period applicable to the Joint Consent Order." (Pls.' Opp'n 11.)

23

as a demonstration of bad faith. *See In re Capital One Deriv. S'holder Litig.*, 979 F. Supp. 2d 682, 700 (E.D. Va. 2013) (citing *Stone*, 911 A.2d at 373). The Court is mindful that Delaware law does not require plaintiffs to plead particularized facts sufficient to sustain a judicial finding that the directors acted in bad faith, nor must the complaint demonstrate a reasonable probability of success. *See Westmoreland*, 727 F.3d at 726, 729. But plaintiffs nonetheless must make a threshold showing that their claims have some merit. *See id.* They have failed to do so. Accordingly, the complaint will be dismissed. Because plaintiffs have failed to adequately plead demand futility, the Court need not address defendants' argument that the complaint fails to state a claim under Rules 9(b) and 12(b)(6).

Defendants seek a dismissal with prejudice. Plaintiffs make a cursory request for leave to amend in the event of dismissal. Federal Rule of Civil Procedure 15(a)(2) directs a district court to freely grant leave to amend a complaint "when justice so requires." District courts nevertheless have "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009).

Plaintiffs have had a number of opportunities to amend the complaint. The original complaint was filed in August 2012. Shortly thereafter, as described *supra* note 1, the case was consolidated with 12 C 6883. In November 2012, plaintiffs filed a consolidated complaint, which substantively amended the original complaint in that it added allegations about the Joint Consent Order, which had been issued in September 2012. Defendants moved to dismiss the consolidated complaint. In lieu of responding to that motion, plaintiffs sought leave to amend yet again, which was granted. Plaintiffs then filed the current complaint, the amended

24

consolidated complaint, in February 2013. Their brief does not explain how they propose to amend the current complaint or why they believe a second (really, a third) amended complaint would survive a motion to dismiss. As a result, the Court doubts that plaintiffs can further supplement their allegations of demand futility to satisfy the requirements of Delaware law, but will give plaintiffs the opportunity to file a memorandum in support of their request for leave to amend. The Court will therefore dismiss the complaint without prejudice at this juncture. If plaintiffs do not file a timely memorandum or it appears from the memorandum that amendment would be futile, the Court will dismiss this suit with prejudice.

## CONCLUSION

Defendants' motion to dismiss the amended verified consolidated shareholder derivative complaint [68] is granted, and the complaint is dismissed without prejudice. Plaintiffs are granted leave to file by April 10, 2015 a memorandum in support of their request for leave to amend the complaint. If they fail to do so, the Court will dismiss this suit with prejudice.

**SO ORDERED.**                                         **ENTERED:    March 23, 2015**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**